PROYOSTY, J.
This suit is by Mrs. Tooke upon a bond given to secure the performance of a building contract against R. B. Burke, the contractor, and his sureties, S. Dillard, W. T. Strain, and W. A. Givens.
One defense is that the plaintiff breached the contract by interfering with the work and in divers ways hampering Burke; but of this defense suffice it to say that it is disproved.
[1] The next defense is that plaintiff released Burke from the contract, and that thereby the sureties were released.
Plaintiff’s husband, Tooke, who acted for her throughout as her agent, and Mr. Reynolds, the legal adviser of plaintiff, testify positively that Burke was not released; and the written document executed by Burke to serve as evidence of his having abandoned the contract makes no mention of a release from the obligations of the contract.
Burke testifies that “they,” meaning plaintiff's husband and Mr. Reynolds, told him that, if he consented to the abandonment of the contract, “they wouldn’t give me any further trouble.”
The defendant Dillard testifies that on March 24th, the day on which the said document of abandonment was executed, he and his two cosureties went to see Tooke and tried to induce him to release them from the bond; that he refused; that they then went to the courthouse, and entered suit against plaintiff to compel the release; that, after having done so, they went to where the building was being constructed, and there met Tooke, who told them that since they had been there in the morning he had released Burke.
The defendant Strain testified to the same effect.
In dealing with Burke on that day, Tooke had his legal adviser, Mr. Reynolds, at his elbow, and was acting on his advice. It was Mr. Reynolds who drew up the document to evidence the abandonment. The inability of Burke to go on with the contract, and the necessity he was under, therefore, to abandon it, was a foregone conclusion, and was not the main point of interest in the minds of the parties; but the main point of interest was as to whether or not the expense of complet *749 ing the building should be borne or not by Burke and his sureties. Under these circumstances, it is utterly improbable that Mr. Reynolds would have consented to release Burke, and thereby release the sureties. The fixed intent was to enforce the bond. Therefore we are satisfied that Tooke, in speaking to these sureties about Burke’,s release, must have been referring to the document which had been executed that day, in the interval between the first and the second visit of the sureties, by which Burke had abandoned the contract, and not to any release of Burke in the sense of liberating him from the obligation of the contract. And we are confirmed in that view by the following:
“Q. Mr. Dillard, what did you hear Tooke tell Mr. Strain on that day with reference to Burke’s release? A. He told me and Mr. Strain that he had let Burke out. Q. Did he give a reason? A. For the reason that he didn’t think he could build the house.”
This was a good reason, it will be noted, for releasing Burke in the sense of acquiescing in his abandonment, but not in the sense of liberating him and his sureties from the obligation of the contract. And Mr. Strain testifies to the same effect, that the reason assigned by Tooke for having “released” Burke was that:
Burke “couldn’t build the house for the money. * * * Q. Released him from what? A. The contract. Q. Did you understand from that that he had discharged Mr. Burke? A. Yes, sir; discharged him from the contract. Q. Because he did not think he could build it satisfactorily? A. Yes, sir.”
It is a recognized rule in the law of evidence that oral admissions are a weak kind of evidence, because so easily misunderstood or misconstrued. We can reconcile the testimony by construing the statement made by Tooke as having had reference to the document which had been executed that day in the interval between the two visits of the sureties; and, so construing it, the conclusion must be that Burke was not released from the obligation of the contract.
While the testimony of Mr. Burke appears to be very straightforward and candid, and makes a most favorable impression as to its verity, yet the fact must not be lost sight of that the sureties discredit him by their next defense, in which they show that he made misrepresentations to them in order to induce them to sign his contractor’s bond. Mr. Reynolds is the, only disinterested witness in the matter; and the probabilities are that he as a lawyer would have known better than to allow his client to release the principal on the bond, while intent upon holding the sureties. And no reason can be assigned why Tooke should have been any more favorably disposed towards releasing Burke than towards releasing the sureties. Burke at that time was a property owner, and the maxim of the law is that no one is presumed to relinquish rights gratuitously.
The next defense of the sureties is that Burke secured their signatures by means of false representations, and that in so doing he was the agent of plaintiff.
The facts upon which this defense is based are as follows: Plaintiff advertised for bids for the construction of the building in question, and received seven bids ranging from $7,000 to $11,000, and one, that of Burke, of $4,640. Although the advertisement required that the bids should be accompanied by a check, and Burke’s was not, plaintiff accepted that of Burke. Tooke had been advised by the architect who had prepared the plans and specifications for the house that it could not be built for less than $7,000. Before he accepted Burke’s bid, he had been informed by the architect that the materials alone for the construction of the house would cost at least as much as this $4,640 bid. Burke, however, was confident that he could execute the contract for that amount and make a profit, and so assured Tooke. One witness testifies that Tooke asked him to sign Burke’s bond, and that he refused. Burke and the *751 sureties lived in the neighboring parish. He secured the signatures by representing that the difference between his bid and the next lowest was only $150; that the construction of the building would cost less than his bid, leaving him a good margin of profit. The sureties, on becoming informed of the real facts, went to see Tooke, and told him of their having been induced to sign the bond by Burke’s misrepresentations, and asked to be released. Tooke answered that he would do so if they and Burke would pay him $1,430. This they refused to do, and they notified Tooke that they would not consider themselves bound. At that time no expense had yet been incurred. Later, after the trenches for the foundation had been dug, and the shanties for storing the tools and materials had been built, and nearly all the sand, lime, cement, and brick that would be needed for the building had been bought and hauled to the spot,- the sureties had the interviews with Tooke which have been hereinabove referred to, and brought suit as hereinabove stated. The building was completed at a cost of $11,235.95, and this suit is for the difference between that amount and the contract price of $4,640, or rather for a part of that difference equal to the amount of the bond, $4,640.
[2] We find not an iota of evidence going to show that Burke was the agent of plaintiff in soliciting the signatures on his bond. He was simply a contractor with plaintiff, and furnished the bond just as any other contractor might have done. However little Tooke’s conduct may commend itself to one’s sense of equity, this court is a court of law, authorized to decide according to equity only in the absence of law, and the law of the matter is that the building contract was made between parties having full capacity to contract, with no concealment or misrepresentation whatever on the part of plaintiff, and was therefore a perfectly valid contract ; and that the bond given for its execution was executed by parties having full capacity to contract, and with no concealment or misrepresentation whatever on the part of plaintiff. When plaintiff closed the contract with Burke and accepted the bond, she had .good reason to know that she was making a contract in which Burke was bound to lose and she bound to derive an unconscionable advantage; but Burke’s mistake was not induced by her, and therefore did not have the effect of invalidating the contract.
“Not all foolish transactions are fraudulent, and it is neither the duty nor within the power of the courts to relieve a person from a contract merely because it is in its terms unwise or even foolish.” 12 Ruling Case L. 237.
“Where a purchaser or seller of any property, real or personal, buys or sells upon a mistaken idea of its nature, quality, or value, this mistake of one unless induced by the other, does not affect the binding force of the agreement. So where the mistake is as to some other collateral attribute of the agreement, as where a person thinking that the other is insolvent buys his note or where a person through error in computations and neglecting to take into consideration certain features of the work offers to erect a building for too small a sum, or where a station agent, on application of a shipper for the rate of freight, quotes, through a mistake in the instructions to him, a lower rate than the real rate.” 9 Cyc. 395.
[3] And, in like manner, when Burke tendered to Tooke the bond duly signed, be was not bound to set an investigation on foot to ascertain whether the signatures of the sureties had not been obtained by fraud. The bond was being given for the execution of a contract which had been duly advertised, and as to which the sureties had had a full opportunity to inform themselves if they had chosen to do so. The misrepresentation was made by Burke in his own interest, without plaintiff’s having been a party to it, or, indeed, even knowing of it.
“To enable a surety to avoid his contract by reason of fraudulent or false statements, it is essential that the creditor or obligee be connected therewith.
“Fraud practiced by the principal alone upon the surety will not affect the liability of the latter, as no duty is imposed on the obligee to seek *753 out the sureties and ascertain whether they have been misled.” 32 Cyc. 64.
“Contracts of suretyship cannot be avoided by the surety because of fraud of the principal debt- or not participated in by the creditor.” 14 A. & E. E. of L. 154, note.
See, to same effect, Reusch v. Keenan, 42 La. Ann. 419, 7 South. 589.
The decisions relied upon by the defendants are not in point. Freeland v. Briscoe, 3 La. Ann. 255, is founded upon the proposition that, “where the principal’s indebtedness does not exist, the collateral contract is a nullity.” In Lazarus v. McGuirk, 42 La. Ann. 194, 8 South. 253, the matter was between the original parties. Succession of Girardey, 42 La. Ann. 499, 7 South. 673, declared in the brief to be analogous to this case, has, we find, no bearing at all. In Macready v. Schenck, 43 La. Ann. 479, 9 South. 470, sureties were very properly denied the right to invoke the fraud of their principal as a defense. In Lachman v. Block, 47 La. Ann. 514, 17 South. 153, 28 L. R. A. 255, the matter was between the original parties; the defendant, erroneously supposing he owed the debt, asked for time, and this was sought to be relied on against him as an estoppel, when, on discovering.his error, he refused to pay. Needless to say, the case has no bearing. In Newman v. Scarborough, 115 La. 860, 40 South. 248, 112 Am. St. Rep. 278, the defendant was relieved, not because there had been fraud or misrepresentation, but because there had been error bearing on the substance, and therefore no consent, and ergo no contract. The document the defendant had signed had mentioned no amount. The debt to be secured by it had been represented to her to be $1,100, whereas it was more than that number of thousands; and therefore the question presented was whether she was to be held for the hundreds or for the thousands. In the case at bar, the error of the sureties was not as to the substance of the contract. The contract which they consented to was the one which they intended to consent to, namely, a building contractor’s bond. Their error bore, not on this contract, but on the contractor’s contract, and only in regard to whether it was a profitable one or the reverse.
[4] Counsel quote 14 A. & E. E. of L. 1159, to the effect that a so-called continuing guaranty may be withdrawn at any time on notice. But we do not see what this has to do with a building contractor’s bond duly executed and delivered. Counsel surely do not contend that sureties on such a bond may retire at any time on notice, and be bound only for what may have been done up to the time of notice given.
[5] The learned counsel for defendant argue that plaintiff might have forfeited the contract with Burke, and thus saved herself from loss; and that it was her duty to minimize the damages. But evidently plaintiff was under no obligation to renounce the benefit of the contract which Burke had been unwise enough to make with her, nor to release the defendants who had bound themselves as sureties on this contract. Of course, she was under the obligation to use her best endeavors to minimize the expense of completing the building; but there is no suggestion that she did not do this.
The judgment appealed from is set aside, and it is now ordered, adjudged, and decreed that the plaintiff Mary S. Tooke have judgment against the defendants, H. B. Burke, S. Dillard, W. A. Givens, and W. T. Strain, in solido, for the sum of $4,640, with 5 per cent, per annum interest thereon from judicial demand, October 29, 1914, and that the defendants in solido pay the costs of this suit.
SOMMERYILLE, X, takes no part.