(127 So. 347)

COOK v. RUSTON OIL MILLS & FERTILIZER CO., Limited, et al.

No. 28647.

Feb. 3, 1930.

Rehearing Denied March 5, 1930.

Dhu Thompson, of Ruston, for appellants North Louisiana Brick Co., Tucker, Mitchell, Smith, H. M. Lomax Lumber Co., Thompson, Richie & Co., Null, Shinpock, Davis & Jimerson, Gaar, and Adams.

J. C. Henriques, Manning W. Heard, and William W. Ogden, all of New Orleans, and

Elder & Everett, of Farmerville, for appellant Union Indemnity Co.

Hudson, Potts, Bernstein & Sholars, of Monroe, and E. L. Walker, of Ruston, for intervening appellants Ruston Hardware & Furniture Co. and others.

Barksdale, Warren & McBride, of Ruston, for appellee Cook.

ROGERS, J.

This is a proceeding in concurso brought by the owner against the contractor, his surety, materialmen, and laborers under a building contract entered into on August 2, 1923. The contract called for the erection on plaintiff's lot in the town of Ruston of a brick dwelling for the price of $7,250. A contractor's bond in the sum of $5,000 was furnished, and both the contract and bond were inscribed in the parish records.

The work was begun on or about September 1, 1923, and, after it had reached a certain point, was abandoned by the contractor and taken over and completed by the owner when the surety company, although duly notified, had refused to do so.

The building contract was executed pursuant to the provisions of Act No. 139 of 1922. Plaintiff alleged full compliance on his part with the statutory provisions, and deposited in the registry of the court $282.95, the balance remaining in his hands of the contract price, after he had completed the work on the default of the contractor. He prayed for a concursus in which the various claimants might assert their claims against the contractor and his surety and for the release of his property from all liens. The liens amounted in the aggregate to $7,194.76.

The defendants pleaded fraud and collusion between the owner and the contractor, in-

sufficiency of the bond, material changes in the contract, and anticipation of payments.

The surety on the contractor's bond impleaded the Ruston Hardware & Furniture Company, one of the claimants, as its indemnitor on the bond.

On these issues, two judgments were rendered. The first judgment was annulled on appeal and the case remanded, because the court below had excluded certain testimony. See Cook v. Ruston Oil Mills & Fertilizer Co., 161 La. 876, 109 So. 534. On the second trial, the court below rendered judgment in favor of all but one of the claimants against the contractor and his surety for the amount of their respective claims, limiting the amount of recovery against the surety company to the amount of the bond, ordering the payment of the costs out of the proceeds of the bond and the amount on deposit in the registry of the court, the balance to be paid pro rata to the claimants, and decreeing the cancellation of the liens on plaintiff's property. The judgment further rejected the demand of the surety company against the Ruston Hardware & Furniture Company as indemnitor.

This appeal is by thirteen of the claimants and by the surety company.

Plaintiff has moved for the dismissal of all the appeals, except the one taken by the surety company.

Plaintiff alleges as grounds for his motion to dismiss the appeals:

(1) That the transcript of appeal was not filed within the time prescribed by law.

(2) That the order obtained by the surety company for an extension of time within which to file the transcript did not inure to the benefit of the other appellants; their interests being diverse to that of the surety company.

(3) That, additionally, as to the appeal of E. A. Gaar, no order of appeal was obtained by the appellant.

■ The record fails to show that appellant E. A. Gaar obtained an order of appeal. Hence as to him the motion to dismiss is well-founded. An appeal without an order granting it is nonexistent, and cannot be entertained by this court. Sammons v. N. O. Ry. & Light Co., 143 La. 731, 79 So. 320.

As to the other twelve claimants, the motion to dismiss must be denied. Those appellants, as well as the surety company, perfected their appeals by furnishing separate bonds of appeal. There was only one judgment rendered by the court below, and only one transcript was needed to present the appeals to this court. Conceding that the interests of the claimants and the surety company inter sese are diverse, nevertheless the interests of all of the appellants are common quoad plaintiff, the owner of the building. The surety company contends that the owner and his property are bound to the claimants for the full amount of their claims, and the claimants make the same contention. A judgment against the owner in favor of the surety company will undoubtedly benefit the claimants and accord with their demands. The case is within the doctrine of Gardner v. O'Keefe, 155 La. 447, 99 So. 398, rather than within the doctrine of Rojas & Conner v. Seeger, 122 La. 218, 47 So. 532.

■ Our conclusion is that the order for an extension of time procured by the surety company for the filing of the transcript of appeal protected not only its own appeal but also the appeals of the other appellants.

Plaintiff applied to the court below for an order directing the clerk of court to furnish him with a certificate showing that no objection had been made by any claimant to the sufficiency or solvency of the surety on the contractor's bond within ten days after the filing of the petition for a concursus. Plaintiff's demand was based on section 4 of Act 139 of 1922, and his purpose was to present the clerk's certificate to the recorder of mortgages and obtain the cancellation and erasure of all inscriptions created by the recordation of the contract, bond, and claims.

Plaintiff's petition was filed in the office of the clerk of court on August 5, 1924. The claimants were served subsequent to August 6, 1924, the day on which the citations were dated and issued. All the answers were filed on or before August 16, 1924. Plaintiff contends that objection to the sufficiency and solvency of the contractor's bond should have been urged on or before August 15, 1924.

It is true that section 4 of the statute provides for the issuance of a certificate by the clerk of court, if the sufficiency or solvency of the contractor's bond is not objected to "within ten days after the filing" of the concursus. But it is equally true that section 2 of the statute provides that, if there are any recorded claims against the work, "the owner or other interested person may file a petition in a Court of competent jurisdiction citing all claimants, including the undertaker, contractor, master mechanic, or engineer, against whom said claims are filed and the surety on the bond, and shall therein assert whatever claim he has against any or all of them and require said claimants to assert their respective claims; and all of said claims shall be tried in concursus."

The two sections of the statute referred to, when construed together, clearly disclose that the mere filing of the petition for a

concursus is not sufficient to bring the claimants into court; a citation to each claimant being indispensable for that purpose. The claimants are not required to assert their claims, including, necessarily, objections to the sufficiency or solvency of the surety on the contractor's bond, until they are ordered to do so in the manner and form provided by law; that is to say, until they are served with copies of the plaintiff's petition together with citations addressed to them and prepared in accordance with the prescribed form.

It is significant that the ten days' delay prescribed by the statute for making objections to the sufficiency or solvency of the contractor's surety coincide with the ten days' delay allowed by Code Prac. art. 180, for answering plaintiff's suit.

Our conclusion is that claimants' answers, wherein objection was made to the contractor's bond, being filed within ten days from the dates they were respectively cited as prescribed by law, were seasonably filed within the contemplation of the statute. The court below did not err, therefore, in denying plaintiff's motion.

The defendants set up that plaintiff failed to comply with his contract in numerous particulars, and that, by reason thereof, plaintiff and his property are liable for the payment in full of all claims of the furnishers of labor and material. The surety company contends additionally that, because of the several breaches of the contract by plaintiff, it is released from its obligations thereunder.

One of defendants' contentions is that Act No. 139 of 1922 imposes the duty on the owner to record the plans and specifications as well as the contract and bond, and that plaintiff failed to comply with the statutory requirement.

The contention, so far as the surety company is concerned, is not well founded. A surety is not released as to the owner because the building contract and bond have not been recorded. Section 6 of Act 139 of 1922.

So far as the claimants are concerned, the contention is also untenable.

The legislative act provides in section 1 for the recordation of the contract and in section 2 for the recordation of the bond. There is no provision of the statute that requires the recordation of the plans and specifications. In the absence of such a requirement, it is not necessary to record plans and specifications, which, although referred to in the contract, are not parts of the contract in the sense that they should be recorded.

Another of defendants' contentions is that the contractor's bond is insufficient. If this were true, obviously it would not discharge the surety on the bond. So far as the claimants are concerned, the proven facts are that the contract price was $7,250, and the bond was for $5,000. The bond is for more than 50 per cent. of the contract price, which is in accordance with the statutory provision.

Plaintiff, as owner, was not bound to estimate the cost of the building. It was sufficient for him to enter into the written contract and to secure a solvent bond in the amount required by law. Tooke v. Burke, 141 La. 746, 75 So. 668.

Another of defendants' contentions is that the plaintiff took over and completed the work prior to registering in the mortgage office notice of the contractor's default. No

injury is alleged or shown by any defendant by reason of the failure of plaintiff to file the notice of default earlier. Certainly the defense cannot avail the surety who is limited to the same defenses as the contractor; and we do not think it would be disputed that this particular defense is one that the contractor could not successfully interpose to plaintiff's suit.

■ The sole object of the statutory provision requiring registry of the default of the contractor is to fix the date from which the statutory limit of thirty days for the recording of claims begins to run. There is no pretense by any of the parties to this suit that the claims of the furnishers of labor and material were not timely recorded. Hence the claimants are without interest to raise this particular defense.

■ Another defense is that certain work not covered by the contract was done at the instance of the plaintiff. This alleged extra work consisted of a garage and certain walks and driveways. The erection of the garage and the construction of the walks and driveways is called for by the plans and specifications, which are made part of the building contract by reference. In fact, the specifications provided that the garage should be built first, so that the materials for the remainder of the work might be stored therein. The testimony shows that this was done. The testimony also shows that the contractor estimated the cost of the garage and driveways in submitting his bid. There is no merit in the defendant's contention.

Another defense is that material changes were made in the contract at the suggestion of and by direction of plaintiff, which changes added considerably to the cost of the building. Eliminating the garage and driveways, which we have shown cannot be considered as extra work, these changes were relative to the tie walls, foundations, flooring, mantels, and a few other things not necessary to mention.

The court below found that some of the changes favored the owner and some of the changes favored the contractor, and that, on the whole, the cost of plaintiff's building was not materially increased thereby. We do not find any error in the court's finding.

Another defense is that plaintiff anticipated payments in violation of his contract.

The contract provided for payments to be made the contractor as follows, viz. $2,000 on execution of the contract; $2,000 when brick work was well under way as determined by architect; $2,000 when the roof was on and the finishing work begun; and $1,250 upon completion and acceptance of the work.

The only amount paid to the contractor was $2,000 on the execution of the contract. No objection, however, is made to this payment. The contractor began the work in the middle of August, 1923. When the second payment was due, the contractor requested plaintiff to retain the amount and pay it out on the contractor's orders, as that was the only way the contractor had of keeping books on the job; and the third payment was handled in the same manner.

The owner began making payments on October 27, 1923, against the second installment of $2,000. At that time the record leaves no room for doubt that the brick work was well under way. From October 27, 1923, to and including December 1, 1923, plaintiff paid $1,947.55 on the second installment.

Plaintiff began making payments against the third installment on December 3, 1923.

At that time the evidence in the record satisfies us that the roof was on and the finishing work begun. Plaintiff paid out in December, 1923, the sum of $898, and in January, 1924, up to and including January 19, plaintiff paid out the sum of $1,145.10.

Between October 27, 1923, and January 19, 1924, inclusive, plaintiff paid out $3,990.65 on account of the second and third payments calling for $4,000. All these payments were made directly to the laborers and to the materialmen.

Shortly after January 19, 1924, the contractor abandoned the work, which was almost completed at the time. The work was actually completed by the owner, after the surety company, upon due notification, had refused to do so.

■ We do not think the evidence shows that plaintiff anticipated the payments as provided in the contract, although the payments themselves were made in a different way than as originally agreed upon. The change in the manner of payment was made in good faith, and did not result in injury to either the claimants or the surety company.

The court below held the defense untenable, and we concur in the ruling.

■ Another defense is that the plaintiff and the contractor were guilty of fraud and collusion. The court below found that the charge was wholly unsupported by the evidence. In this we think the court is correct. There is nothing to indicate fraud in the fact that there was considerable difference between the bid of the contractor and the bid of the next lowest bidder. The testimony shows that the architect drew plans and specifications for a building to cost approximately $7,000. He testified that the building in question could be constructed for about

that amount. The contract obtained by the owner called for the expenditure of $7,250, and the bond was signed by the surety company, presumably after due investigation, insuring the construction of the building for the amount named. Nor was it a fraudulent, or even a suspicious circumstance, that plaintiff, through his architect, exercised a certain amount of authority in the selection of the material and in the direction of the work. He was well within his legal rights in demanding that the obligations of the contract be fulfilled by his obligor.

The Ruston Hardware & Furniture Company, Limited, excepted to the right of the surety company to implead it as the alleged indemnitor of the surety company. The court below overruled the exception, which ruling the exceptor contends was erroneous.

The pertinent clause of the indemnity agreement reads as follows, viz.:

"To indemnify the company (Union Indemnity) from any and all liability, loss, costs, damages, attorney's fees, and expenses of whatever kind or nature which the company may sustain or incur by reason or in consequence of executing any such bond or bonds as surety or co-surety or procuring upon its full indemnity the execution thereof as aforesaid."

It is clear that under the agreement, as quoted, the indemnitor undertook to indemnify the surety company not only against any loss or damage it might suffer or expenses it might incur but also against all liability it might become subject to because of its execution of the contractor's bond. When the surety company was impleaded in this suit for the purpose of imposing liability upon the company under its contract of suretyship, the condition of the indemnity agreement was broken, and the indemnitee's right of action

arose, even though the indemnitee had sustained no actual loss or damage at the time the indemnitee sought to exercise its right.

The Ruston Hardware & Furniture Company, Limited, is one of the claimants, demanding from the contractor and the surety company an amount in excess of $3,000. The counter demand of the surety company against the Ruston Hardware & Furniture Company, Limited, as its indemnitor, is in the nature of a defense, set-off and claim in reconvention.

The case of Bain v. Arthur, 129 La. 143, 55 So. 743, is inapplicable to the present case. There the agreement of the indemnitor was to hold the surety company harmless from any loss, damage, and expenses. Here the agreement of the indemnitor is, in addition to those obligations, to hold the indemnitee harmless from all liability of whatever kind or nature. There the indemnitor was not seeking a judgment, as the indemnitor is doing here, against the indemnitee in amount almost equal to the amount of the indemnitor's obligation under the indemnity contract.

Our conclusion is that the action of the court below in overruling the alleged indemnitor's exception of no right of action was correct.

On the merits of the call in warranty, the Ruston Hardware & Furniture Company, Limited, contends that it is in no wise liable on the alleged indemnity agreement on the grounds: First, that the agreement was not authorized by the board of directors of the corporation; and, secondly, that the agreement was beyond the powers of the corporation under its charter, and therefore ultra vires.

The surety company, on its part, pleaded estoppel to the defense of the Ruston Hardware & Furniture Company, Limited, that the execution of the indemnity agreement was an ultra vires act.

The surety company signed the contractor's bond only because of the agreement of the Ruston Hardware & Furniture Company, Limited, to indemnify it against all loss in consequence of its signing said bond. The contract of indemnity itself was executed in pursuance of what purported to be a resolution adopted at a special meeting held by the board of directors of the Ruston Hardware & Furniture Company, Limited. The copy of this resolution which was delivered to the contractor's surety is certified as correct by W. F. Willis, the secretary of the corporation, and the indemnity agreement is signed on behalf of Ruston Hardware & Furniture Company, Limited, by S. B. Richie, its general manager. Mr. Richie is also the vice president of the corporation.

The evidence shows that no meeting of the board of directors of the Ruston Hardware & Furniture Company, Limited, was held. Mr. O. E. Hodge, the president of the corporation, and a member of its board of directors, testified to this and to the further fact that he had no knowledge of the so-called resolution until about the time it was rumored that Evans, the contractor, had abandoned the work. This might very well be the case, because, although Mr. Hodge maintains an office in the town of Ruston across the street from the establishment of the Ruston Hardware & Furniture Company, Limited, the record shows that he devotes practically all his time to his private business interests, which are varied and extensive, and that he gives little or no attention to the business and affairs of the Ruston Hardware & Furniture Company, Limited.

The Ruston Hardware & Furniture Company, Limited, is a corporation capitalized at $50,000, represented by 500 shares of stock of

the par value of $100 each. This stock is owned as follows, viz. O. E. Hodge, 215 shares; S. B. Richie, 33 shares; Mrs. S. B. Richie, 175 shares; W. F. Willis, 55 shares; Walter Wilder, 10 shares; the remaining 12 shares being apparently owned and distributed between Miss Annie Davis and Mrs. H. Goodwill.

The charter of the corporation provides for a board of directors to consist of five stockholders and to hold its meetings annually. The company has no by-laws. At the annual meeting of the stockholders of the corporation held on July 10, 1923, which was about a month prior to the execution of the indemnity contract, only four directors were elected; namely, O. E. Hodge, W. F. Willis, S. B. Richie, and Walter Wilder. At the annual meeting of the board of directors held immediately after the stockholders' meeting on the same day, the following officers were elected to serve during the following year, namely, O. E. Hodge, president; S. B. Richie, vice president and general manager; and W. F. Willis, secretary-treasurer.

Richie, who handled the resolution and signed the indemnity agreement, Willis, who certified to the correctness of the resolution, and Miss Davis, who inscribed the resolution in the minute book, owned and represented a majority of the capital stock of the Ruston Hardware & Furniture Company, Limited. Richie was the vice president and general manager and Willis was the secretary-treasurer of the corporation, and together constituted one-half of the total membership of its board of directors.

It cannot be disputed that the indemnity agreement was signed by Richie, the general manager of the Ruston Hardware & Furniture Company, Limited, in furtherance of the business interest and for the promotion of the welfare of the corporation. The so-called resolution expressly declares that the indemnitor is materially interested through the sale of material in the transaction in which the contractor has applied to the surety company for a bond. And the indemnity contract itself recites that the indemnitor has a material and beneficial interest in the obtaining of the bond by the contractor. The proof in the record supports these recitals.

▰ In these circumstances, our conclusion is that the defense that the act of the vice president and general manager of the Ruston Hardware & Furniture Company, Limited, in signing the indemnity agreement was ultra vires cannot prevail. The contract itself was made in good faith, fully performed by the other party, and the corporation has had the benefit thereof. Some of the cases supporting our conclusion are the following, viz. Hagerstown Brewing Co. v. Gates, 117 Md. 348, 83 A. 570, 574; Armour & Co. v. Rosenberg & Co., 36 Cal. App. 773, 173 P. 404; Burg & Sons v. Twin City Co., 140 Minn. 101, 167 N. W. 300; Clowe v. Imperial Pine Products Co., 114 N. C. 304, 19 S. E. 153; Eastern Shore Brokerage & Commission Co. v. Harrison, 141 Md. 91, 118 A. 192. See, also, C. J. vol. 14A, pp. 359, 360.

In the case of Hagerstown Brewing Co. v. Gates, supra, the Court of Appeals of Maryland said:

"In Thompson on Corporations, vol. 2, § 1576 (2d Ed.), the learned author, after stating that 'the governing principle with reference to the general power of a manager is that where he has the actual charge and management of the business, by the appointment of or with the knowledge of the directors, the corporation will be bound by his acts and contracts which are necessary or incident in the course of the business, without other evidence of actual authority,' says:

" 'The reason for this rule is that the corporation, by the very fact of the appointment of such manager, holds him out to the public as the person authorized to bind it by contracts necessary in the prosecution of its business. It has been said that the very use of the word "manager," when applied to the officer, conveyed the idea to the ordinary mind that to one thus named had been committed the management of the affairs of the corporation; and to hold that one dealing with the person so held out must, before the corporation can be held liable for his acts, show affirmatively that it had authorized them, would often result in great hardship.' "

And in the case of Armour & Co. v. Rosenberg, supra, the Court of Appeal, First District of California, held, as set forth in the syllabus:

"A corporation is estopped to deny the authority of its manager to guarantee the account of its customer with another company, where it has received benefits under the contract with its customer pursuant to which its manager guaranteed his accounts."

In the body of the opinion, the court expresses itself as follows, viz.:

"It is not contended that trading corporations may indiscriminately guarantee their customers' purchases from others, or exercise generally the functions of corporations chartered for the special purpose of executing surety or indemnity contracts. Whether such a corporation would have power to lend its credit to another with whom it had no business, or where such an accommodation had no relation to the business it was organized to transact, is not here presented. The rule denying corporations the right under such circumstances is one of strict construction applied by the earlier cases based upon the doctrine of ultra vires, that a corporation may not enter into a contract or do any act not specifically authorized. The contract here sued upon involves a different principle.

"The question presented by the different assignments of error is whether or not the general manager of a trading corporation has the implied power to guarantee debts or obligations of a customer or other person when such course is deemed by him necessary for the promotion of the business of the corporation. · The obligation here guaranteed had relation to the corporation's own interest and was designed to promote its own business. In such a case the rule now seems to be firmly established that trading corporations may, in furtherance of their own interests, extend financial aid to their customers (citing numerous authorities) and this aid may be in the form of a guaranty. 10 Cyc. 1105."

The defense that the indemnity agreement was beyond the powers of the indemnitor under its charter, and therefore ultra vires, must be considered and passed on in connection with the plea of estoppel filed by the surety company, the indemnitee.

There can be no doubt, from the evidence, that the indemnity contract was signed on behalf of the Ruston Hardware & Furniture Company, Limited, in order to insure the execution of the building contract between Cook, the owner, and Evans, the contractor, so that the indemnitor might be able to sell to the contractor such materials and supplies as it handled and he might need in the construction of plaintiff's building. The record discloses that Cook, the owner, Lomax, the architect, Evans, the contractor, and Payne, the salesman for the indemnitor, held frequent meetings in the office of the Ruston Hardware & Furniture Company, Limited, prior to the execution of the building contract, and the agreement entered into by Payne, on

behalf of his company, with Evans, the contractor, for supplying the latter with materials and supplies, was based on figures obtained from the plans and specifications.

The Ruston Hardware & Furniture Company, Limited, as a consequence of the building contract herein, actually sold materials and supplies to an amount in excess of $3,100. The corporation is demanding in this proceeding payment of a claim for $3,156.30 as a materialman against the contractor's surety.

It is manifest, therefore, that the Ruston Hardware & Furniture Company, Limited, stood to benefit materially by the building contract between Cook and Evans, on which its indemnitee was surety. If the arrangement does not, in the end, prove profitable to the indemnitor, that fact cannot affect the legal situation.

Whatever may be the purport of the earlier decisions relative to acts of a corporation deemed to be ultra vires, the trend of the modern jurisprudence is to sustain the validity of corporate acts performed in furtherance of the corporate business. The modern tendency in this respect is well expressed in the case of Koehler & Co. v. Reinheimer, 26 App. Div. 1, 49 N. Y. S. 755, 757, from which we liberally quote as follows, viz.:

"Its business was the manufacture and sale of beer. Hyland was about to open a saloon, in which beer should be sold. He had not, before that time, been a customer of the plaintiff, but he promised, in case the plaintiff executed this guaranty, that he would buy his beer of it, and the guaranty was executed for the purpose of securing a customer, and that was its object. The contract to guaranty this lease was not illegal in the sense that it was forbidden by the statute, or that it was against public policy. It is ultra vires, if at all, simply because it does not relate to something within the purview of the objects for which the corporation was organized. A trading corporation like this has the right to foster its legitimate business by all usual and proper means, and it may make all contracts which are useful or necessary to enable it to carry on the business or accomplish the objects of its incorporation. * * *

"The doctrine of ultra vires took its rise at a very early day in the history of corporations, at a time when they were not common, and were created for quasi public purposes, and regarded to a certain extent as public in their nature. At that time not only was their manner of contracting closely limited, but their power to make contracts was jealously guarded, and the courts were not slow to invalidate any act by which a corporation might go beyond the express powers which had been granted to it. But that doctrine has been considerably limited in later days. Corporations are now organized to carry on every kind of business which may be performed by individuals. The purposes of trading corporations are in no way public in their nature. So far as the people are concerned, whether a corporation shall make one contract or another, so long as it advances the purposes for which the corporation was organized, is absolutely unimportant; and so the rule has come to be laid down that, except as restrained by law, trading corporations have the implied power to make all such contracts as will further the objects of their creation, and their dealings in this regard may be likened to those of an individual seeking to accomplish the same ends. * * *

"In examining the question whether a contract of a trading corporation is beyond its powers, it is not very important whether the contract was a sagacious one to make or not. If it appears that the thing done tended to increase the business it was organized to do, the

courts need not concern themselves with the question whether the contract was a wise one. The simple question is, if the contract were carried out, whether it would have been likely to increase the business of the corporation. In this case, as the contract appears to have been made with the purpose of obtaining a customer for the plaintiff's beer, the only thing to be examined is whether, if the arrangement had been carried out as expected at the time the contract of guaranty was entered into, it would have tended to increase the sales of the commodity in which the plaintiff dealt.

"The arrangement with Hyland may not have reached the dignity of an enforceable contract, but yet it may well have resulted in a great increase of the plaintiff's business; and, if so, it was undoubtedly a reasonable contract for it to make. The purpose of the plaintiff's organization was to make and sell beer. It was undoubtedly competent to enter into any contract adapted to further that purpose, and not against public policy. * * *

"It may be said that there was nothing to show that the contract was one which was customary to be made in the business; but that is of no importance. The question is whether, upon a consideration of all the facts, it appears that the contract was one which could have fostered the purposes for which the corporation was organized. If it might, then it was within the power of the corporation to make it; otherwise not. That question, as it seems to us, must clearly be answered in the affirmative in this case."

The legal principle which is recognized and expressed in the foregoing decision renders of little practical importance the right to urge the doctrine of estoppel against a plea of ultra vires. Nevertheless, the doctrine of estoppel has always been effectively used to prevent a corporation which has received the benefits of an executed contract, not malum in se nor malum prohibitum, from escaping liability thereon on the ground that it is ultra vires. We think the doctrine of estoppel is peculiarly appropriate in this case.

"A corporation cannot defend an action on a guaranty on the ground of ultra vires where it has received the benefit of the contract." Lemmon v. East Palestine Rubber Co., 260 Pa. 28, 103 A. 510; Standard Brewery Co. v. Creedon, 283 Ill. 474, 119 N. E. 581.

The decision of this court in Robert Gair Co. v. Columbia Rice Packing Co. et al., 124 La. 198, 50 So. 8, has been cited as laying down a different rule. The question there, however, was not precisely the same question as is presented here. In that case the contract of the Columbia Rice Packing Company to purchase from the Robert Gair Company a large number of cartons for packing rice was guaranteed by the Columbia Rice Milling Company, through its secretary. The suit was by the Gair Company against the packing company, its original debtor, and the milling company, as the guarantor of the debtor, to recover the balance due under the contract. The milling company, by way of defense to the suit, set up that its secretary was without authority to bind it in the matter, and that the giving of the guaranty was outside of and beyond its powers. The first ground of the defense was held untenable because the evidence showed that the guaranty was executed with the knowledge and consent of the president and directors of the milling company. The second ground of defense, however, that the guaranty was ultra vires, was maintained.

In reaching its conclusion, the court found that the charter of the milling company did not provide for the giving of guarantees or indemnitees. The court further found that, while the stockholders of the milling compa-

ny owned some of the stock of the packing company, the companies were, as a matter of fact, separate and independent corporations, that the packing company was not a mere instrumentality of the milling company, and that no consideration moved to the milling company, and that company derived no benefit whatsoever from the contract of guaranty. In other words, that the obligation guaranteed was not designed to, and did not, promote the business of the guarantor. Hence the court very properly maintained the defense of ultra vires set up by the milling company.

The reasons which we have hereinabove indicated for holding the Ruston Hardware & Furniture Company, Limited, liable under its agreement to indemnify the contractor's surety renders it unnecessary for us to pass upon the other issues raised by the indemnitor. These issues are that the indemnitee was estopped from pleading estoppel against the indemnitor, that the so-called meeting of the board of directors of the hardware and furniture company should have been called by the president and notice thereof given to each director, and that the indemnity agreement should have been executed by the president, and not by the general manager, of the corporation.

The Union Indemnity Company, the surety on the contractor's bond, prayed for judgment against the Ruston Hardware & Furniture Company, Limited, its indemnitor, in whatever amount it might be held liable for on its bond and for the further sum of $532.59 as fees of the attorneys employed by the company to represent it in these proceedings and for the reimbursement of the traveling expenses of its adjuster in investigating the claims of W. H. Cook, the owner of the building.

We do not think that the amount claimed for attorneys' fees and adjuster's expenses are properly chargeable to the Ruston Hardware & Furniture Company, Limited, and therefore cannot allow them.

The amount due the claimants and for which they were awarded judgment is $6,882.-77, with interest from judicial demand. The amount deposited by Cook, the owner, in the registry of the court as the balance in his hands under the contract, was $282.95, out of which the costs of these proceedings are ordered to be paid. Therefore it is clear that the Union Indemnity Company, as surety on the contractor's bond, will be called upon, under the judgment against it, to pay out $5,000, the amount of its obligation on the contractor's bond, together with 5 per cent. per annum interest from judicial demand until paid. The surety company is therefore entitled to a judgment for a like amount against its indemnitor.

For the reason assigned, the motion of W. H. Cook, plaintiff, to dismiss the appeals herein, is denied, except as to the appeal of E. A. Gaar. As to the appeal of E. A. Gaar, the motion is sustained, and the appeal is dismissed.

It is ordered that the judgment appealed from so far as it rejects the demands of the Union Indemnity Company against the Ruston Hardware & Furniture Company, Limited, its indemnitor, be annulled.

It is further ordered that there be judgment in favor of the Union Indemnity Company against the Ruston Hardware & Furniture Company, Limited, in the full sum of $5,000, with 5 per cent. per annum interest thereon from judicial demand until paid; all costs of litigating the demand of the Union Indemnity Company on its indemnity contract to be paid by the Ruston Hardware & Furniture Company, Limited, indemnitor.

It is further ordered that in all other respects the judgment appealed from be affirmed.

O'NIELL, C. J., absent.

**(127 So. 356)**
**BERGER v. QUINTERO.**
No. 29548.
March 5, 1930.

Richard A. Dowling, of New Orleans, for appellant.

Delvaille H. Theard, of New Orleans, for appellee.

**OVERTON, J.**

[1] This is a suit for $5,354.12, paid to defendant, as plaintiff's attorney, by Emile Pomes, notary public, in a partition of the effects of the succession of plaintiff's mother, Anna C. Czarnowski, widow of Peter St. Amand. The validity of the payment, made by the notary to defendant, was recognized by this court in the Succession of Czarnowski, 158 La. 1093, 105 So. 76.

On the day that defendant received the foregoing amount from the notary, he made out an itemized statement of the amount which he considered due the firm, of which he was a member, for legal services rendered in matters involving considerable property, and for costs expended on plaintiff's behalf, showing a balance due plaintiff of $1,107.62. and mailed the statement to him with his check for the amount of this balance, and accompanied this remittance with a letter stating that the check was for the balance due plaintiff, appearing on the statement inclosed. Plaintiff alleged that he never accepted this check, nor approved of the settlement offered, and prayed for a trial by jury, which was granted.

Defendant answered the suit, averring that the amount remitted was the correct balance due, and pleading that, as defendant caused the check to be certified by the bank on which it was drawn, he thereby accepted it, and that, as the check was sent him with the declaration that it was in settlement of the balance due, he thereby accepted it in full settlement of that balance.