FOURNET, Justice.
 

 The Hassie Hunt Trust, as the sub-lessee that had for more than a year (by virtue of an assignment of the lease executed by the defendant’s ancestor in title) been in possession of the oil, gas, sulphur,, and other minerals underlying certain lands in Evangeline Parish belonging to-the defendant, Crowell Land and Mineral Corporation, and was actively engaged in drilling for and producing oil therefrom,, availing itself of the provisions of Act 205-of 1938, instituted this jactitation or slander of title suit against the defendant landowner to protect its possession. After the two instruments under which the plaintiff allegedly had possession of the premises-as sub-lessee were filed in response, to the defendant’s prayer for oyer, the defendant, converted the suit into a petitory action by asserting title in itself on the ground, that the lease under which the plaintiff took possession of the premises had expired by its terms. A certified copy of the lease in question was made a part-of the defendant’s petition and other interested parties were joined in the suit. The plaintiff then filed exceptions of no cause and no right of action to the defendant’s petition in the petitory action and the defendant appealed suspensively when the trial judge sustained these exceptions and. dismissed its action.
 

 Under the well recognized rule of procedure, by converting this jactitation suit into a petitory action, the defendant became the plaintiff in such' action and assumed the burden of proving its title to the property rights in controversy (Arent v. Hunter, 171 La. 1059, 133 So. 157) and the rule of law that for the pur
 
 *950
 
 pose of disposing of the exceptions of no cause and no right of action all of the well pleaded allegations of fact in a petition must •be accepted as true is applicable.
 

 The undisputed facts of this case are that the defendant’s ancestor in title, the Crowell and Spencer Lumber Company, Ltdv for the recited cash consideration of $1,045.36 leased certain property owned by it in Evangeline Parish on June 9, 1919, for mineral exploration for a term of 25 years. This lease, under its terms, was kept in full force and effect by the payment of $1 per acre yearly rental until 1943, at which time the plaintiff, Hassie Hunt Trust, that had by an instrument dated November 1, 1942 (later supplemented by instruments dated November 1, 1943, and May 11, 1944), become the sub-lessee of .this lease, took possession of the premises by beginning the drilling of a well that was completed as a producer in paying quantities that same year and has continued the development of this property with the result that at the time the 25 year period had elapsed four wells had been completed as producers on the property and, at the time this suit was filed on October 4, 1944, three more had been completed. This suit was instituted when the defendant declined to sign a division order for the oil produced from the property in accordance with the provisions of the lease contract without the inclusion in such order of a provision stipulating that no royalties would be paid the plaintiff after the twenty-fifth year from the date of the lease, or after June 9, 1944, contending that under the express terms of the contract of lease it terminated on that dale regardless of the production of oil in paying quantities prior to that time.
 

 The prefatory remarks to the lease in question characterize the instrument as an
 
 "agreement and contract of lease”
 
 and after giving the status of the parties, the consideration, and the description of the property, contains eleven enumerated sections in which are found the conditions thereof. (Italics ours.)
 

 The first section states that the objects and purposes for which the lease was granted was to permit the lessee “to search for minerals of all kinds * * * and doing all things necessary to accomplish the objects and purposes of this Lease ‡ ‡ ‡ »
 

 The second section simply imposes restrictions upon the use of the described lands, limiting the use of the surface area to only those parts absolutely necessary for the purpose of carrying out the purposes of the lease.
 

 By the third section the lessor specifically reserves and excepts from the lease all timber on the leased premises and makes provision for remuneration for such timber as may be used or damaged as well as the location of the wells with respect to one of the buildings on the leased premises.
 

 In the fourth section it is declared:
 
 "This lease is to continue in full force and
 
 
 *952
 

 effect for a period of twenty five (25) years from its date unless it becomes null and ■void at an earlier díate by virtue of the failure of the ‘Second Party" * * * or sub-lessees to comply with and fulfill any of the conditions herein entered into, or otherwise.”
 
 It is further declared that default or violation of any of the conditions of the lease shall render the same null and void.- (Italics ours.)
 

 By the fifth section the lessee is obligated to commence actual and bona fide operations on the leased premises within 12 months from the date of the lease and tc prosecute such operations “diligently and continuously by drilling and so on, until the stratum of oil, gas, or sulphur, or some other mineral deposit, is found, and developed in marketable quantities * * or until such depth is reached as to satisfy the operators that no such deposits can be found under the land at the point at which the operation is going on” and provides further that the lessee shall have the right to make as many successive attempts as he may please to find oil, so long as not more than six months intervenes between such attempts,
 
 "provided
 
 also,
 
 that no further attempts or operations shall be conducted or attempted after the maximum period of twenty-five (25) years from this date.”
 
 (Italics ours.)
 

 The sixth section provides for the payment of a royalty of 1/8 part or portion of all of the oil produced, and saved on the leased premises, or a 1/8 of the proceeds of any sale of the same, less such oil as may be used in the development and consumed on the premises. This section also contains further provisions that are not pertinent to a determination of the issue presented to this case.
 

 In the seventh section it is declared that if oil, gas, or other minerals be found in paying quantities, the lessee shall become vested “with an Estate in and to all such minerals underlying the said land with the exclusive right to produce the same, as long as any of the said minerals shall be produced in paying quantities,
 
 but always and ever subject to the conditions and covenants set forth in this lease.”
 
 (Italics ours.)
 

 The eighth section provides for the payment of an annual rental of $1 an acre in lieu of the drilling provided for in the fifth section, such payment having the effect of renewing and continuing the lease in force at the option of the lessee
 
 "but not exceeding the life of this lease which is Twenty-five (25) years from its date.”
 
 It is also provided in this same section that once operations are commenced in accordance with the provisions contained in the fifth section, the lease will be maintained without further rental payments, and that the provisions of the eighth section, once, the lease is kept alive by the commencement, prosecution, and continuance of the operations, “shall not be afterwards available.” (Italics ours.)
 

 
 *954
 
 The ’ninth section provides that all operations shall be conducted at the expense of the lessee but that the lessor is bound not to permit any liens or encumbrances to affect any of the leased premises.
 

 By the tenth section the lessor is given the right to remove from the lands during the life of the lease, and for 30 days thereafter, any installations or other improvements placed thereon by the lessee for the purposes of the lease.
 

 The eleventh section obligates the lessee, after the termination of the lease, to execute and sign a relinquishment and cancellation of all of the rights and privileges granted in the contract.
 

 It is the contention of the defendant that oil and gas leases must be construed most strongly against the lessee and in favor of the lessor, consequently, the contract in controversy being such a lease, when the provisions of Sections 4, 5, and 8 are considered, particularly the portions thereof hereinabove quoted from and italicized, it is clearly demonstrated that the intention of the parties was to limit the terms of this lease to 25 years, regardless of production, arguing that the lessee, being obligated under the terms of the fifth section to begin actual and bona fide operations on the property within 12 months from the date of the lease and to continue operations successively thereafter every six months during the 25 years of the lease until oil was produced in paying quantities, unless the lease was abandoned sooner, the right found in the eighth section providing for the yearly delay rentals is only “an act of grace to lessee and amounted to liquidated damages payable- by lessee because of his failure to drill within one year.”
 

 The plaintiff, on the other hand, contends that the 25 year period referred to in Sections 4. 5, and 8 was intended as the primary term of the lease, that is,, the time during which the lessee or sub-lessee had a right to search for and produce minerals in paying quantities from the property, pointing out that the very object of the lease as expressed in the first section was to permit the lessee to explore for and produce minerals and - that while it is true the fourth and fifth sections do contain the clause relied on by the defendant, these sections must be considered with the eighth, and when they are so considered, the conclusion is inescapable that it was optional with the lessee as to whethet he would comply with the provisions in the fifth section or whether he would continue the lease in force from year to year by the payment of $1 per acre “as long as the ‘Second Party,’ desires to hold the lease in force,” and that the clause relied on by the defendant, “but not exceeding the life of the lease, which is Twenty-five (25) years from its date,” immediately following this clause qualifies the time during which the lessee can keep the lease in force by the payment of delay rentals, but that when oil was found in paying quantities, the primary object of
 
 *956
 
 the lease had been accomplished and the term was extended as provided in the seventh section where it is stated: ■“ * * *
 
 it is expressly agreed
 
 and covenanted
 
 that if oil,
 
 gas, sulphur or other minerals,
 
 be found in paying quantities,
 
 through the efforts of the ‘Second Party,’
 
 .and in compliance with the conditions of .this lease, then the 'Second Party’ shall immediately become Vested with an Estate in and to all such minerals underlying the said land with the exclusive right to produce the same, as long as any of the said minerals shall be produced in paying .quantities
 
 * * (Italics ours.)
 

 “Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. * * * In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used.” 6 R.C.L., Permanent Supplement Edition, 834, Section 225. As expressed in our Revised Civil Code, “* * * courts are bound to give legal effect to all * * * ■contracts according to the true intent of all the parties” and this “intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.” Article 1945.
 

 For our guidance in arriving at such intention, the codifiers of our Civil Code have laid down the following rules:
 

 “When there is a doubt as to the true sense of the words of a contract, they may be explained by referring to other words or phrases used in making the same contract.” Article 1948.
 

 “When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.” Article 1950.
 

 “When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect, rather than in a sense which would render it nugatory.” Article 1951.
 

 “Terms, that present two meanings, must be taken in the sense most congruous to the matter of the contract.” Article 1952.
 

 “All clauses of agreements are inter-) preted the one by the other, giving to each the sense that results from the entire act.” Article 1955.
 

 The contention of the defendant, based on a commentary by Thornton on Oil and Gas Law and allegedly relied on by the court for its decision in the case of Rives v. Gulf Refining Co., 133 La. 178, 62 So. 623, that oil and gas leases are construed most strongly against the lessee and in favor of the lessor is not only in direct conflict with these provisions of our Revised Civil Code, by which we must be guided in interpreting contracts in this state, but, as was very aptly pointed t, out by Summer in his later work on Oil
 
 *958
 
 and Gas, Permanent Edition, Vol. 2, Section 372, p. 270, while it is true this expression “is quite common in the opinions, it is submitted that while viewed as a statement of fact it may be true enough, but that viewed as a rule of construction it has no sound foundation.” The Rives case furnishes an excellent example of the correctness of this comment for although Thornton was quoted as authority for this statement in the Rives case, .it was not decisive of the’ issues, the court’s reason for deciding adversely to the lessee in that case being, as stated in the opinion, that it was construing the contract between the lessor and the lessee in accordance with the lessee’s own construction thereof and this construction was at variance with the lessee’s contention on the trial of the case.
 

 After studying and analyzing the several sections of the contract in controversy in the light of these cardinal rules of interpretation, we find little difficulty in arriving at the conclusion contended for by the plaintiff and upheld by the learned trial judge, i. e., the contract considered as a whole, taking each section in connection with the others, when the object of the contract is kept in mind, shows the parties intended the 25 year period to’ be the primary term of the lease, or, in other words, the term during which the lessee and his sub-lessee had a right to search for and discover minerals in paying quantities under the property. But upon the happening of that event, the lessee became vested with the exclusive right to produce the same as long as such minerals continued to be produced in paying quantities, as declared in Section 7, and the lease was continued so long as these minerals were produced in paying quantities.
 

 We think a careful study of the several sections in controversy will reveal the accuracy of the conclusion we have reached. For example, a fair analysis of Section 5, where the limitation of 25 years is expressly referred to, clearly discloses that the lessee was obligated to commence actual and bona fide operations for the discovery of minerals within 12 months from the date of the lease and to continue this, search diligently until minerals were found and produced in paying quantities, provided not more than six months elapsed between such attempts and the concluding provision in said section that no further attempts shall be made after 25 years had elapsed was unquestionably intended to qualify the provisions of that section only, that is, that the time during which the lessee had a right to discover and produce-minerals in marketable quantities was-limited to the 25 year period and if such minerals were not found within that period, then the lease was at an end and tire lessee or sub-lessee no longer possessed the right to continue his attempts to discover such minerals.
 

 The same is true with respect to the concluding provision of the eighth section,
 
 *960
 
 where the lessee is given the right,
 
 at his option,
 
 to forego compliance with the provisions to be found in the fifth section with reference to diligently and successively attempting to find minerals and yet continue the lease in full force and effect by the yearly cash -advance payment of $1 an acre as long as the lessee desired to hold the lease in force, and, like the controverted phrase in the fifth section, the concluding phrase in the eighth section shows it was the intention of the parties to thereby limit the time within which the lease could thus be kept in full force and effect by the payment of these delay rentals to the 25 year primary term of the lease and not beyond that time.
 

 Thus it may be seen that the 25 year limitation clause found in the fourth, fifth, and eighth sections, when considered in the light of the object of the lease, that is, the search for minerals and their production in paying quantities, and with the seventh section, clearly demonstrates that it was the intention of the parties that this lease contract should continue in full force and effect upon the happening of the event expressed as its object, i. e., the finding of the minerals in paying quantities and their production within the primary term (25 years) and thereafter as long as these minerals continued to be so produced, the concluding clause “but always and ever subject to the conditions and covenants set forth in this lease,” being intended to qualify the clause just preceding it in the said section wherein it is declared that “It is expressly agreed and covenanted that if oil * * * be found in paying quantities * * * in compliance with' the conditions of this lease, then
 
 the ‘Second Party’ shall immediately become vested with an Estate in and to all such minerals underlying the said land with the exclusive right to produce the same,"
 
 and has reference in particular to that section of the contract requiring the lessee to pay and deliver to the lessor “a Royalty of One-Eighth (1/8) part or portion
 
 of all oil produced and saved on said leased premises,"
 
 (Section 6), as well as to the other sections dealing with the lessee’s good husbandry during the actual operations on the leased premises. In our opinion it has no reference to the conditions stipulated in the fourth, fifth, and eighth sections of the contract, as contended by the defendant. That the parties by the inclusion of this clause did not intend the lease to be terminated at the end of the 25 years if the property was then producing minerals in marketable quantities is obvious, for they failed to so stipulate and this they could very well have done as they so very carefully did in including this condition in the sections in which they did intend it to apply.
 

 By this construction effect is given to all of the clauses in the sense that results from the entire act according to the language used and we think this construction is clearly within the intendment of the contracting parties. To hold other
 
 *962
 
 wise and as contended for by the defendant would .not only render meaningless some of the clauses in the contract but would result in absurd consequences. For example, to have allowed the lessee or his sub-lessee to continue the contract of lease, the express object of which was to permit the lessee to search for and produce minerals in paying quantities, in full force and effect by the yearly payment of $1 an acre delay rentals for the full period of 25 years and then, just prior to the expiration of this 25 year period, during which it is stipulated minerals must be produced in paying quantities under penalty of the lease’s expiration, to suddenly bar him from producing the minerals that have just been found by him in paying quantities after he has, under the very terms of the lease, “become vested with an Estate in and to all. such minerals underlying the said land with the exclusive right to produce the same, as long as any of the said minerals shall be produced in paying quantities,” is, to say the least, ridiculous and it is- fantastic to assume the lessee in entering into this cont ract intended any such iniquitous situation. Tf he had it would mean that he was willing to spend the yearly delay rentals for 25 years and was willing to go to the expense attendant upon the discovery of minerals and their production for the sole satisfaction of seeing the minerals developed on this property and of seeing the landowner reap the harvest thus made possible by him at this great expense.
 

 For the reasons assigned, the judgment appealed from is affirmed, at the cost o,f the appellant.
 

 PONDER, J., absent.