89 So.2d 135

Arthur MELANCON

v.

The TEXAS COMPANY et al.

No. 42688.

May 7, 1956.

Rehearing Denied June 11, 1956.

Richard S. Lake, Liskow & Lewis, Charles C. Gremillion, Lake Charles, for defendant-appellant.

Joseph M. Rault, Jr., Kalford K. Miazza, Terriberry, Young, Rault & Carroll, New Orleans, Miazza & Drury, New Orleans, of counsel for plaintiff-appellee.

FOURNET, Chief Justice.

This is a suit to cancel an oil, gas and mineral lease executed by the landowner plaintiff, Arthur Melancon, and now held by the defendant, The Texas Company, affecting a 120 acre tract of land situated in Lafourche Parish;[1] and this appeal is from a judgment ordering the cancellation.

The undisputed facts in the record show that the lease was granted by the plaintiff on July 20, 1944, for a primary term of 5 years, with a $600 bonus or cash consideration, to G. L. Paret, who within a few days assigned same to the defendant, The Texas Company; and by agreement between the plaintiff and that Company on February 27, 1948, for an additional consideration or bonus of $600, the lease was extended for an additional primary term of 5 years. It contained the usual clause for the termination of the lease unless drilling was commenced on or before 12 months from date, with the privilege of delaying such termination by paying annual delay rentals of $5 per acre, and the usual one-eighth royalty clause in case of production of oil or gas in paying quantities; and in case gas is not sold or used, the lessee was granted the privilege of paying a $100 royalty per well per year as "shut-in royalty."

The delay rentals were paid up to and including those due on July 20, 1951, thereby maintaining the contract in effect for another year. In the fall of 1951 The Texas Company, availing itself of a provision in the lease,[2] executed a unit declaration, recorded on October 20, 1951, to cover a unitized area of 40 acres, comprising a portion of the property of plaintiff, of Donald Bollinger, the owner of adjoining land, and of others. A well commenced on

---

1. The land is described as a certain tract on the left descending bank of Bayou Lafourche, located in Section 31, T. 17 S., R. 19 E., and also R. 20 E., being bounded above by property of Donald Bollinger, below by property of Valentine Plantation, Inc., and in the rear by the 40 arpent line; it appears on maps in the record as a long, narrow strip, rectangular in shape, with a short frontage on the Bayou.

2. "Lessee at its option, is hereby given the right and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty and mineral interests in the immediate vicinity thereof, when, in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate said leased premises so as to promote the conservation of oil, gas or other minerals * * *. Such pooling shall be of tracts which will form one contiguous body of land for each unit and the unit or units so created shall not exceed forty (40) acres each * *. Lessee shall execute in writing and record in the Conveyance Records of the Parish in which the land herein leased is situated an instrument identifying and describing the pooled acreage; and upon such recordation, the unit or units shall thereby become effective. * * * Drilling or reworking operations on or production of oil, gas, * * * from land included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term as to all of the land covered hereby * * *." (Paragraph 11.)

the unit on October 27, 1951, and situated on Bollinger's land, was finally abandoned as unproductive on March 24, 1952.[3] On the 19th of the following month The Texas Company executed and recorded a second unit declaration covering a different forty acre tract but again comprising portions of the lands of plaintiff and of Donald Bollinger. On May 10, 1952, operations for the drilling of a well were begun on Bollinger's property in that unit; the well, known as Donald Bollinger Unit Six Number One well, following tests in which it was found to be productive of gas and distillate in Southcoast No. 2 and Southcoast No. 3 Sands, was completed in the latter sand on August 7, 1952. On September 8, 1952, the well was opened for the production of gas and distillate by delivery of gas into the gas fuel line of The Texas Company, then being used to supply rig fuel to various operators in the vicinity. The gas and distillate produced were sold by The Texas Company to others and, in some instances, to itself; but during this entire period no payment was made or tendered for royalties from the production and sale of the gas and distillate, either to plaintiff or to those to whom plaintiff had sold fractional mineral and royalty interests, of which sales the defendant had been advised. However, after the production of gas and distillate, as above stated, on various intermittent dates between September 8 and October 31, 1952, the well was temporarily shut in and the defendant Company, on November 4, 1952, did forward to the plaintiff its check for $75, representing three-fourths of the stipulated "shut-in gas royalty" of $100 per well per year—the plaintiff at that time having disposed of mineral interests totaling one-fourth;[4] and again on August 6, 1953, the Company forwarded another "shut-in gas royalty" check for $50 to cover plaintiff's remaining fractional interest.[5] Those checks were received by plaintiff but were not cashed.

At conferences between the plaintiff and officials of The Texas Company in October, 1952, and March, 1953, on which occasions the Company was seeking to have the property owners, including the plaintiff, agree to a larger unit than the area of 40 acres stipulated in the lease contract, the plaintiff not only refused to agree to a re-

3. Bollinger's lease had expired on its face on December 30, 1951, but was being maintained in force under the provisions of paragraph 6 thereof.

4. On July 6, 1949, plaintiff sold a one-fourth mineral interest to Harvey Peltier and Donald Peltier; Harvey Peltier later (May 21, 1951) sold a 1/32nd interest to Donald W. Rhea.

5. Three additional sales by the plaintiff, each conveying a 1/16th of the oil, gas and other minerals in and under the land affected by the lease, were made on September 10, 1951, to Duard Dymard, Emile T. Eymard, and Louis J. Eymard; on September 20, 1951, to Dolty Cheramie; and on February 28, 1952, to John B. Plaisance; plaintiff's remaining interest of 9/16ths were subject to a sale of a 1/128th royalty interest to Dave J. Robichaux on October 22, 1952.

vision of the unit but at those times showed dissatisfaction with the treatment he had received at the hands of the company.[6] It was not until November 18, 1953, and after the plaintiff, through his attorney by letter dated November 10, 1953, formally notifying the defendant that because of various failures on its part to discharge its obligations as lessee, including non-payment of accrued royalties, that the lease had been cancelled, and requested execution of a formal surrender of the lease in accordance with LSA–R.S. 30:102, that for the first time the amount due plaintiff from the sale of gas and distillate used or sold by The Texas Company, for the period extending from July 31, 1952, through October, 1953, was tendered to plaintiff; but the checks were promptly returned. Royalties were tendered monthly thereafter, but were refused. This suit followed on May 11, 1954.

In the plaintiff's petition, after recitation of the foregoing facts, the plaintiff requested a judicial cancellation of the lease on several grounds, pleaded in the alternative and substantially as follows: (a) failure to pay delay rentals on July 20, 1952; (b) failure to pay a shut-in gas payment within a reasonable time from the completion of the well; (c) inadequacy and invalidity of the shut-in gas clause of the lease providing for payment of $100 per year per well, and the failure to pay delay rentals on July 20, 1953; (d) lack of authority to maintain the lease of plaintiff by a shut-in gas and distillate well not located on his land, though within the same unit; (e) invalidity of unit declaration because executed after expiration of primary term of Bollinger's lease; (f) failure to produce said well for a period in excess of 90 consecutive days without the payment of delay rentals or prosecution of further reworking or drilling operations; (g) lack of authority of the defendant to treat the well as a "shut-in" gas well when there was a demand for gas in the vicinity, and failure of the Company to adequately market said gas; (h) failure to pay or tender production royalties from the sale of gas or distillate, from date of initial production, despite repeated oral and written demands by the plaintiff, until the lease had been declared forfeited; (i) failure to reasonably and prudently develop the lease. The prayer was for cancellation of the lease and for attorney's fees in the sum of $20,-000, under LSA–R.S. 30:102.

·For answer the defendant, The Texas Company, generally denied all legal grounds for cancellation of the lease, and in substance its position may be stated to be that under the contracts of lease with the land-

---

6. Plaintiff claims he could not understand why he was being paid the small amount of $75 when the well was known to be a producer, and when he had received $600 as delay rentals before there had been any production; that he declined to have any further dealings with .the company and demanded payment of the royalties due. This is disputed by the company and will be discussed later.

owners, it had a right to declare the 40 acre units; that its drilling operations within the units followed by production within the last unit sufficed to maintain all leases within the unit including that of the plaintiff; consequently, it was not necessary to tender delay rentals on either July 20, 1952, or July 20, 1953, because drilling operations were being conducted at that time; nor was it necessary to tender shut-in gas royalties, as was done in November, 1952, and August, 1953, since the lease was being maintained by production; that there was no ready or acceptable market for the gas, though negotiations were commenced with various gas pipe line companies which enabled the company at a later date—after this suit was filed—to conclude a contract for sale of the gas at a much higher price than was obtainable before; the company denied that demand had been made for payment of production royalties prior to November, 1953, or that it had refused to pay—the excuse for not paying being that negotiations were being carried on with the plaintiff and other lessors in the field for revision of the units so as to develop the area on 160 acre spacing, and that royalties which had accrued were being withheld pending the result of such negotiations.

On these issues the trial judge heard the case on the merits, took the matter under advisement, and rendered a well considered opinion in which, after detailing the several grounds urged by the plaintiff for the cancellation of the lease, singled out those problems relating (a) to the payment of royalties on shut-in gas wells and (b) to the payment of production royalties, and observing that the well could not be both a shut-in well and a producing well, concluded from the facts of the case that "Bollinger Unit 6 Number 1 well was a producing well." He thereupon proceeded to decide the case from that viewpoint, and after an analysis of the evidence he rejected the defense that there had never been a refusal on the part of the Company to pay royalties, finding as a fact that "While there has been no such declaration in words, there has been its equivalent in deeds." He also found no merit in the defense that a forfeiture would be warranted only if there were a refusal to pay following formal demand, and after expressing doubt of the requirement of a formal demand he said that if such were required, the evidence showed that the plaintiff himself had made oral demand at least three times, without success, and he concluded that, the contract being silent concerning a specific date for payment, the failure of the defendant Company to pay royalties within a reasonable time in accordance to custom of the trade amounted to a failure of consideration. The judge finally concluded "that the non-payment of royalties by the defendant was not the result of negligence or inadvertence, but a studied and purposeful nonfeasance designed and intended to pressure the plaintiff into the acceptance of an enlarged production unit contrary to his express desires and the terms of the contract."

In disposing of defendant's contention, based on paragraph 8 of the lease,[7] that even if there were grounds for forfeiture, there could be none until there had been judicial ascertainment that the lessee had failed to perform and discharge its obligations, after which the lessee had to be given the opportunity to remedy its defections, the trial judge declared that the paragraph "relates to the judicial ascertainment of facts, conditions or circumstances that are the subjects of a bona fide dispute and as to which there is a real disagreement in good faith between the parties, such as the quantum of royalties due because of disputed ownership or for any other undetermined reason, or a question as to whether or not there had been reasonable development under surrounding circumstances, or some other undetermined fact; under which conditions a lessee in good faith would appear to equitably deserve the opportunity to conform or comply with judicially ascertained findings of fact," and consequently not applicable to the facts of the case here.

The defendant-appellant, in addition to the defenses originally advanced below and disposed of by the trial judge in his written reasons, as well as an additional defense urged there for the first time in an application for rehearing, i.e., that the lessee was entitled to withhold payment of royalties under the provisions of Paragraph 7 of the lease[8] since there were more than six

7. "*After production of oil, gas, sulphur or other mineral has been secured from the land covered hereby, this lease shall not be subject to forfeiture or loss, either in whole or in part, except after judicial ascertainment that the Lessee has failed to perform and discharge its obligations hereunder and has been given a reasonable opportunity thereafter to prevent such loss or forfeiture by complying with and discharging its obligations as to which Lessee has been judicially determined to be in default.* In case of cancellation or termination of this lease for any cause, Lessee shall have the right to retain under the terms hereof forty acres of land around each well producing, being worked on, or drilling hereunder, unless there be in force in said area at such time a spacing order or regulation of the Conservation Commissioner or other governmental agency allocating more than forty acres to each well, in which case Lessee shall have the right to retain around each such well the number of acres allocated to each well under such order or regulation. The tract so retained shall be designated by Lessee in as near a square form as practicable." (Paragraph 8; italics supplied.)

8. "The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to their heirs, successors and assigns, but no change or division in ownership of the lands, rentals, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. If at any time two or more persons be entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such person or to their joint credit in the depository named herein, or, at Lessee's election, the proportionate part of said rental to which each participant is entitled may be paid or tendered to him separately or to his separate credit in said depository, and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant. Notwithstanding any

parties who had become entitled to royalty payments thereunder, and it had not been furnished with a recordable instrument executed by those parties designating an agent to receive payment, now urges for the first time (a) the defense (based on the remainder of paragraph 8—the unitalicized portion of footnote 7—reserving to the lessee, in event of termination of the lease, the right to retain 40 acres around any producing well or the number of acres, if such number be larger, allocated to each well under a spacing order of the Commissioner of Conservation then in force) that if it should be found there was ground for cancellation of the lease, this provision of the contract must be applied and since, before rendition of judgment in the lower court, larger units had been formed by the Conservation Commissioner and Bollinger Unit 6 No. 1 well was in a unit of 160 acres, which included 38 acres of plaintiff's land, that area must be reserved to the defendant; (b) that if the judgment in plaintiff's favor be maintained at all, it should not only be ineffective as to the acreage reserved as

mentioned in (a), but should be limited to the %6ths mineral interest which plaintiff sued on, he having sold %6ths of the whole mineral interest prior to suit; and (c) that attorney's fees were improperly allowed because LSA–R.S. 30:102 applies only in the case of failure to pay rentals or to carry on operations on a lease within a fixed period of time, and, in any event, no evidence was offered to prove the value of such services.

Counsel for defendant, in his argument in brief, concedes that the lower court correctly found that the well had been a producing well sufficient to maintain the contract, and that "shut-in royalty" payments were unnecessary; and (in view of the fact that the payment of production royalties was delayed until checks were mailed in November, 1953, to the plaintiff and other owners of fractional mineral interests) admits that "It might be said that The Texas Company was negligent in that regard;" but argues "certainly not to the extent to support cancellation," further observing: "True, The Texas Company

actual or constructive knowledge of or notice whatsoever thereof to Lessee or assigns, no change or division in the ownership of the lands, royalties, or rentals, shall be binding upon the owner of this lease unless and until thirty (30) days after the record owner of this lease shall have been furnished by registered United States mail at his or its principal place of business a copy, certified to by the Clerk of the Court, of recorded instrument evidencing same. In event of assignment of this lease as to a segregated portion of said land, the rentals payable

hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. *If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all of such parties designating an agent to receive payment for all.* (Paragraph 7; italics supplied.)

did delay paying Plaintiff a small amount of royalties that had accrued; but * * * it had only reached a total of about $500 in the end, and payment was made before suit was filed." And we think counsel's position is fairly well stated in his further remarks that "The only serious factual dispute between Plaintiff and Defendant is in connection with this phase of the case; and it only relates to testimony of what was *said* by Plaintiff and by Defendant's representatives in connection with accrued royalties and the alleged demands that were made for payment after the well was completed. But it is Defendant's contention that whether Plaintiff's appreciation of the evidence is accepted or not it would make no difference * * *. The Melancon lease, like the usual commercial form, does not fix a time for the payment of production royalties. Nor does it give the right of cancellation for failure to pay or for delay in paying royalties that have accrued. The lease, in fact, by two specific provisions, denies the right of cancellation even if a demand has been made; those provisions being found in paragraphs 7 and 8 * * *." As otherwise stated in the same brief: "* * * *even if the Lower Court's finding of facts is accepted, even if the jurisprudence generally would allow cancellation of some leases after demand· for payment of royalties and a refusal to so 'pay, the lease in this case, which is the law between the parties, by the provisions of paragraph 7, denies cancellation; and that provision in itself should cause the reversal of the* *judgment of the lower court * * *;"* and *"* * * regardless of what happened during the delay in payment of royalties, and even if that delay had reached the point of being a violation of the contract, the lease itself also denied the right of forfeiture by the provisions of paragraph 8, generally referred to as the 'judicial ascertainment' clause * * *;"* concluding *"* * * so the ultimate effect of the . clause must be that it denied the right of cancellation of the lease for a·delay in payment of royalties, when no time was fixed therefor, even though it should be found from the evidence that a demand was made and refused * * *."* In any event, if judgment decreeing cancellation should be upheld, it should be ineffective as to the 38 acres of plaintiff's land within the unit under the Conservation Commissioner's order now in force, should be limited to the $9/16$ths mineral interest owned by plaintiff when suit was instituted, and should deny the allowance of attorney's fees. (Emphasis ours.)

◼◼ In the system of interpretation of oil and gas contracts which this Court has followed for many years, the lessor's royalty under the usual oil and gas lease is placed in the rent category. Such a characterization is well fixed in our law (see Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679, containing a summary and analysis of pertinent cases), and has given little trouble since this Court's pronouncement of more than three decades

past that "* * * a mine or quarry, or land adapted to mining or quarrying, may be leased for a certain portion of the produce of such mine or quarry, and the fact that such portion is called 'royalty,' instead of rent, is not of the least consequence." Logan v. State Gravel Co., 158 La. 105, 109, 103 So. 526, 527. The rule is equally well established that in construing mineral leases, "* * * the codal provisions applicable to ordinary leases must be applied." Coyle v. North American Oil Consolidated, 201 La. 99, 114, 9 So.2d 473, 478; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336.

◼ The provisions of the LSA–Civil Code treating of the subject of lease, to be found under Chapters 1 and 2 of Title IX, Book III, and particularly those under the general heading "Of the Obligations and Rights of the Lessee", stipulate that *"The lessee is bound * * * 2. To pay the rent at the terms agreed on"*, Article 2710, *and if he fails to pay the rent when due, he may be expelled from the property*, Article 2712. Rent is, from the standpoint of the lessor, the primary motive for the contract, and was so recognized in the early case of Kron v. Watsoh, 14 La.Ann. 432, when this Court held that *"The payment of rent, in pursuance of the terms of the contract of lease, is an essential engagement on the part of the lessee, and his non-compliance with it gives to the lessor a right to sue for the dissolution of the contract."* Other provisions of the LSA–Civil Code, pertinent because under our law lease "is a synallagmatic contract, to which consent alone is sufficient * * *", Article 2669, are found in the section treating "Of Conventional Obligations", Title IV, Book III; therein it is stated that "When no term is fixed by the parties for the performance of the obligation, it may be executed immediately, unless, from the nature of the act, a term, either certain or uncertain, must be implied * * *", Article 2050; equity, usage and law may be resorted to in such cases, Article 1964; the word "usage" is defined as "that which is generally practiced in affairs of the same nature with that which forms the subject of the contract. House rent in some cities is generally paid by the month; in others by the quarter. In a contract for the hire of a house, without expressing when the rent was to be paid, the deficiency would be supplied by proof of the usage, * * *." Article 1966. (Emphasis ours.)

◼ In the case of royalty based on gas and oil production it is the accepted custom, as reflected by this very record, to make such payments on a monthly basis, computed on the amount of gas and oil sold or run into the line from the well. A justifiable cause for delay in such payment might arise when there is a reasonable dispute as to those entitled to receive the royalties, or the amount due each, but no such factual situation is here presented, and we agree with the trial judge that a delay of fifteen

months for no valid reason is unjustifiable and violative of the terms of the contract.

A perusal of the several cases relied on by the defendant clearly shows that they are inapposite from a factual standpoint and therefore not controlling here.[9]

 Defendant's contention that there was no "formal demand," that such demand is a necessary preliminary to a refusal to pay, and that in its absence the forfeiture would not be warranted, is not persuasive in the face of the finding of the trial judge, and of our confirmation of his finding, of the defendant's active violation of its obligations under the lease. LSA–Civil Code, Article 1932;[10] Rosenthral v. Baer, 18 La. Ann. 573; Noel Estate, Inc. v. Louisiana Oil Ref. Corp., 188 La. 45, 175 So. 744. But if it were necessary to place the defendant in default because of the fact that the exact time for payment of royalties was not fixed in the subject contract, we are not unmindful of the provisions of the Civil Code that placing a debtor in default may be accomplished verbally, in the presence of two witnesses, Article 1911, and the record, we think, clearly supports the trial judge's finding that the plaintiff asked for payment of production royalties at least three times, at meetings attended by others and in their presence.

According to the testimony of the plaintiff, the first meeting took place in October of 1952 in the office of Mr. Donald Bollinger in Lockport, at which the defendant Company was represented by Mr. Irby Baudoin; also present beside the plaintiff were Mr. Donald Bollinger and his father, Mr. George Bollinger. When the plaintiff was asked to sign an agreement to increase the size of the drilling unit from 40 to 320 acres, he flatly refused, as did Mr. Bollinger; plaintiff then inquired about the payment of his royalty but was told by Mr. Baudoin that that was not his department since he was with the district land office. The next meeting was held in March, 1953, in a camp boat near Mr. Bollinger's shop. At that meeting The Texas Company was represented by Mr. T. Odus Winn, division land and lease man, and Mr. Baudoin; also present, beside the plaintiff, were Messrs. Rene LeBlanc, Donald and George Bollinger, and others. Again the request of the Company officials was for an increase in the size of the units, this time from 40 to 160 acres; again the plaintiff refused to sign, became excited and waved in the air the "shut-in royalty" check of $75 he had received, bitterly complaining that before gas was discovered he was being paid $600 a year, yet now that production had been obtained he was only

9. Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336; Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583; Risinger v. Arkansas-Louisiana Gas Company, 198 La. 101, 3 So.2d 289; and Rudnick v. Union Producing Co., 209 La. 943, 25 So.2d 906.

10. "When there is an active violation of the contract, * * * the creditor is under no obligation to put the debtor in default, * * *."

being paid $75. To Mr. Winn he said: "You are selling oil, you are selling gas. When are you going to pay me?" and was told that "he couldn't pay me [plaintiff] until we [the Company] had a larger unit." Again in June or July the plaintiff called at the office of the defendant company in New Orleans, where he talked with Mr. Ed Munson, in the production department, and again demanded payment; in answer to his question why he was not being paid, he was told "the only way you can get your rental is if you sign one of the new leases we have," which he again refused to do.

■ The testimony of the plaintiff as to the first meeting is corroborated by the testimony of Mr. Donald Bollinger; as to the second meeting, the plaintiff is corroborated in his version of what transpired by the testimony of Donald Bollinger and Rene LeBlanc. The record is quite clear that both plaintiff and Bollinger most positively refused to agree to any larger unit than that established by their contracts with the defendant, and that both requested payment of production royalties, stating in their testimony that the Company representative Mr. Winn advised them that the royalties could not be paid until the size and shape of the new unit had been determined. On behalf of the Company, its Mr. Winn, though denying positively having made the statement at the second meeting "that production royalties could not be paid until the size and shape of the new unit was agreed on," was unable to recall any request being made,

either by plaintiff or Bollinger, for the payment of royalties from production. The defendant's representative Mr. Baudoin, who attended both of these meetings, though present in court during the course of the trial, was not placed on the stand to rebut the testimony of plaintiff and his witnesses in that respect, creating a presumption under our law that had he testified his testimony would have been detrimental to the cause of the defendant. Centanni v. Centanni, 182 La. 632, 162 So. 203; Bourgeois v. Bourgeois, 202 La. 578, 12 So.2d 278; Bates v. Blitz, 205 La. 536, 17 So.2d 816; Succession of Yeates, 213 La. 541, 35 So.2d 210; Olivier's Minor Children v. Olivier, 215 La. 412, 40 So.2d 803; Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582.

After carefully studying and analyzing the testimony in the record we are inclined to agree with the conclusion of the trial judge that a third request for payment of production royalties was made by the plaintiff, as testified by him, in the Company's office in New Orleans when he spoke to Mr. Ed Munson (who testified that his secretary was probably present; however, she was never placed on the stand). While Mr. Munson testified that his recollection was that plaintiff had visited him for the purpose of complaining about a cow that had been lost because of the absence of a fence around an abandoned mud pit at the well near plaintiff's property, he nevertheless recalled that the plaintiff did mention to him "that he wasn't happy about the amount of shut-in royalty he was receiving as com-

pared to some of his neighbors;" and while he would not deny that plaintiff did ask for payment of accrued royalties due him, he stated he had no recollection of such a demand. In answer to the question whether or not he recalled telling the plaintiff that the Company could not pay royalties until it secured lease amendments giving the company authority to unitize the gas wells on 160 acre units, he replied: *"If we discussed it at all,* I couldn't have made a statement just the way you made it. \* \* \* in my position I had no authority to make such a statement \* \* \*." (Emphasis ours.)

Then we have the testimony of Mr. Joseph M. Rault, Jr., an attorney at law employed by the plaintiff in early August, 1953, after plaintiff's failure to obtain results following the meetings mentioned above. Mr. Rault, who made full and complete notes of each interview, detailing what took place, testified that at a conference with Mr. Munson on August 14, 1953, he informed Mr. Munson of the numerous complaints of his client, including the failure to receive production royalties, and Mr. Munson obtained what information he could in view of the lateness of the hour (after 5 p. m.). Another conference was held with Mr. Munson on September 11 (following Mr. Rault's return from a previously arranged vacation) ; on that occasion several inter-office phone calls were made in the presence of the witness in which Mr. Munson inquired from the parties with whom he was talking "whether The Texas Company would pay [the production royalties], or if not, why they were not [being paid]"—it appearing that Munson knew the production royalties had not been paid; and while Mr. Rault was not able to get an exact answer, Mr. Munson stated that one party on the phone had advised there was some title difficulty, another reported the "shut-in royalties" had been paid but the production royalties had not been paid, and another could not be reached; whereupon Munson commented that he didn't know, but "maybe they had not asked for it." After Rault repeated to Munson that the plaintiff and other witnesses had told him that such a demand had been made, Munson observed that so far as he could understand, the production royalties were being withheld because of the provision for 40 acre units in the leases and the Company's desire to increase the unit to 160 acres. Following that meeting the witness Rault, in pursuance to Munson's suggestion, addressed a letter to the Company, dated September 14, 1953, stating that in confirmation of various conversations with Mr. Munson dealing with inquiries about the well his client wished to be given certain information, including "(d) Full details concerning the disposition of the oil and gas produced from the well, including the price the products were sold for, to whom, etc.," and "(e) Full explanation as to what has happened to the royalties from this production, where they presently are, why they were not tendered, etc." No written reply was received. After an exchange of several telephone conver-

sations, a meeting was scheduled for September 23 to further discuss the matters inquired about in the letter, but on the day previous thereto that meeting was postponed at the request of Mr. Munson, on orders of higher Company officials, pending completion of the Rene LeBlanc well, then in process of being drilled, in order that the Company could better evaluate the field from information they were obtaining from that well. The meeting was eventually held on October 27, attended by plaintiff, Mr. Bollinger and their attorney, Mr. Rault, as well as his secretary who was there to take notes; also present were Mr. John Toler, an attorney representing Valentine Plantation whose property was included in the unit; and for The Texas Company, Messrs. Munson, Beauchamp of the Gas Department, and Danielson of the Geological Department. The meeting lasted several hours, during which there was further discussion of matters previously touched upon, but in more detail, and new matters, including the question of production royalties from Bollinger Unit 6 No. 1 well, and Rault testified that the position taken by the Company officials at that meeting was that the defendant would not pay the accrued royalties because of failure to agree to a larger unit, and in response to a pressing inquiry made by one of the other lessors in the unit, the statement was made by Munson that if the Company were really "pushed to the task, they might pay them."

Despite this clear-cut and damaging testimony, when counsel for The Texas Company placed Mr. Munson on the stand, he questioned the witness, not on the matters testified to by Mr. Rault with respect to the several meetings between them, but on the matter previously mentioned in this opinion in referring to Munson's testimony; and while the other two Company representatives present at the meeting of October 27, 1953, were present in Court when the case was tried, Mr. Danielson did not testify and Mr. Beauchamp, who took the stand, was asked no questions pertaining to the discussions had at that meeting.

■ We think that a fair preponderance of the evidence establishes that the trial judge was justified in his finding " * * * that the defendant declined the payment of production royalties until such time as the plaintiff entered into an agreement to enlarge the previously established production unit * * *," and that such non-payment was a studied and deliberate means to coerce the plaintiff to accede to the proposal for revision of the lease and an enlarged production unit.

■ Taking up the argument of counsel in his brief, that the failure to designate an agent to receive payment of royalties in accordance with Paragraph 7 of the lease (the clause which appears in italics in footnote 8) is fatal to plaintiff's suit, a mere reading of the clause relied on, when considered with the remainder of that paragraph, clearly shows that it was placed in the contract for the benefit and convenience of the lessee when sales or

assignments of mineral or royalty rights (which were sanctioned by those provisions) were executed by the lessor; and from the clear language used ("Lessee *may* withhold payment") it is evident that whether its provisions will be invoked is optional with the lessee. It would appear to us that this defense, never having been pleaded specially, coming as it did for the first time after judgment and on motion for rehearing, comes too late; but be that as it may, from our appreciation of the evidence, The Texas Campany never relied on that clause as its reason or excuse for withholding payment of the royalties. Not only was there never, at any time, a request that an agent be designated by the mineral owners for the receipt of payment for all, but when the Company attempted to pay "shut-in royalties" to the owners of fractional mineral interests, payment was tendered according to the ownership of each as reflected by their titles, copies of which had been furnished to the Company. Even when tender was made of accrued production royalties, after plaintiff had declared the lease forfeited on November 17, 1953, royalty checks were similarly mailed out to the various mineral owners. It is our opinion therefore that the trial judge properly rejected the defendant's contention with respect to this clause.

▇ In disposing of the next two defenses, both based on Paragraph 8 of the lease (footnote 7), i. e., that there must be a judicial ascertainment of failure of lessee

to discharge its obligations, following which lessee must be given an opportunity to perform, and that the lease by its terms is free of forfeiture or cancellation as to plaintiff's land (38 acres) included in the present unit, we must do so in the light of the entire instrument. We think the trial judge correctly ruled that the provisions concerning judicial ascertainment apply to a bona fide dispute as to which there is a real disagreement in good faith between the parties; that the effect of the stipulation should be confined to areas of undetermined matters which are the subject of a legitimate dispute, but that a ruling on an issue involving undisputed facts should be final. To hold as contended by counsel for defendant on this point would lead to an anomalous, if not ridiculous, situation, for the lessor would be at the mercy of the lessee; the latter might employ whatever tactics he saw fit to obtain concessions or alterations in connection with the lease, knowing it would never be declared cancelled without his first being given the opportunity to comply after judicial proceedings. As to the remaining provisions of Paragraph 8, declaring that if the lease is cancelled for any cause the lessee will be entitled to retain 40 acres around each producing well, unless there be in force an order of the Conservation Commissioner allocating more than 40 acres to each well, in which event the lessee has the right to retain around each well the number of acres allocated in such Order, we think this is an equitable provision for the benefit of

the lessee and applies to those cancellations involving a bona fide dispute as contemplated in the first clause of this particular paragraph. This conclusion is not only consonant with logic and reason, and leads to no absurd consequences, but is in keeping with the intention of the parties as reflected by the contract they entered into—a reading of the many provisions of which, interpreted the one with the other, gives to each a sense that results from the entire contract.[11]

■ Counsel for defendant has cited no authority, and we know of none, to support his argument that the lease can be cancelled only to the extent of plaintiff's ownership in the mineral rights at the time of filing of suit, or 9/16ths, since he had sold 7/16ths of his mineral interest in the land covered by the lease and the purchasers, who were made defendants in the suit, did not affirmatively seek the cancellation. The record shows that fractional interests were sold by the plaintiff, as follows: July 6, 1949, to Harvey Peltier and Donald Peltier, 1/4th

mineral interest; September 10, 1951, to Duard Eymard, Emile T. Eymard and Louis J. Eymard, 1/16th mineral interest; September 20, 1951, to Dolty Cheramie, 1/16th mineral interest; February 28, 1952, to John B. Plaisance, 1/16th mineral interest; and October 22, 1952, to Dave J. Robichaux, a 1/128th royalty interest. These owners of fractions of the mineral interest, not having joined plaintiff in the suit, were necessary parties and were made parties defendant, as were Valentine Plantation, Inc., and Donald Bollinger, owners of lands adjoining plaintiff and included in the same unit. During the pendency of these proceedings the case was non-suited as to Harvey Peltier, Donald Peltier, and Donald Rhea, to whom Harvey Peltier had sold a 1/32nd mineral interest on May 21, 1951, because of the acquisition of their interest by The Texas Company. The remaining parties mentioned above, with the exception of Dave J. Robichaux, filed no answer, and judgment was rendered against them by default, was duly confirmed, and was further rendered against all defendants, and in favor of

---

11. In the case of Hunt Trust v. Crowell Land & Mineral Corporation, 210 La. 945, 28 So.2d 669, 673, this Court quoted approvingly from Ruling Case Law: " 'Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. * * * In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used.' " 6 R.C.L., Permanent Supplement Edition, 834, Section 225.

We also observed that, "As expressed in our Revised Civil Code, ' * * * courts are bound to give legal effect to all * * * contracts according to the true intent of all the parties' and this 'intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.' Article 1945. * * * 'All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act.' Article 1955." 210 La. at page 955, 28 So.2d at page 673.

plaintiff, declaring the lease null, void, forfeited and cancelled, and only The Texas Company appealed; as to the other defendants, the judgment has now become final.

Lastly, the defendant complains of the fact that the district judge allowed plaintiff attorney's fees in the sum of $4,500, based on defendant's failure to cancel the lease upon demand, under authority of LSA–R.S. 30:102,[12] contending that the provisions of that statute deal only with the optional right to do or not to do the thing that would maintain the contract beyond the option period.

This Court has allowed attorney's fees in suits for partial cancellation of leases in three recent cases: Eota Realty Co. v. Carter Oil Co., 225 La. 790, 74 So.2d 30; Wier v. Grubb, 228 La. 254, 82 So.2d 1; and Nunley v. Shell Oil Co., 229 La. 349, 86 So.2d 62. In the Wier case [228 La. 254, 82 So.2d 5], we pointed out that this Court has consistently held that " * * * 'the main consideration of such a lease is the development of the land for oil and gas and that the lessee must either develop with reasonable diligence, or give up the lease' ", quoting from Caldwell v. Alton Oil Co., Inc., 161 La. 139, 108 So. 314, 315, and citing numerous additional authorities;

and in the course of the opinion observed that "This holding is predicated on the well-recognized theory that a development which fails to amount to a reasonable production affording the lessee a net profit and the lessor an adequate consideration for the continuance of the lease is at variance with the intent and contemplation of the parties * * *." 82 So.2d at page 6. If, in suits decreeing cancellation of the lease because of failure to increase the production so as to increase rentals, a situation is presented permitting the application of LSA–R.S. 30:102 and the recovery of attorney's fees, it logically follows that a total failure to pay rent from production, as in this case, would permit a similar recovery.

However, we have concluded to dismiss the plaintiff's claim for attorney's fees as of non-suit. Although he alleges that, the defendant Company having refused, despite written demand, to grant a cancellation and release of the lease, he has engaged attorneys for the prosecution of this suit and is entitled to reasonable attorney's fees incurred by him, and that for this type of suit, including investigation, legal research, preparation of pleadings, trial and all other work incidental thereto,

12. LSA–R.S. 30:102 declares: "Whenever an optional oil or gas lease shall lapse * * * because of failure on the part of the lessee to comply with the condition for the prevention of forfeiture, the lessee shall within ten days after written demand on the part of the lessor furnish the lessor with an acknowledged instrument, directing the cancellation of the lease on the records. If a lessee, having been given written notice demanding cancellation of the lease, fails or refuses to comply within ten days, he shall be liable to the lessor for a reasonable attorney's fee incurred by the lessor in bringing suit to have the cancellation adjudged. * * *."

reasonable attorney's fees would be $20,000, he offered no evidence to support these allegations. See Whitney-Central National Bank v. Sinnott, 136 La. 95, 66 So. 551; Alfano v. Franek, 159 La. 498, 105 So. 598; Burglass v. Villere, 170 La. 805, 129 So. 209; and Rhodes v. Collier, 215 La. 754, 41 So.2d 669, wherein this Court aptly observed: "It is the well-settled jurisprudence that, * * * in cases where attorneys' fees are allowed, absence of proof that the fees have actually been paid, or an obligation incurred to pay, defeats recovery." 215 La. at page 766, 41 So.2d at page 673.

For the reasons assigned, the judgment appealed from is amended by non-suiting the plaintiff's claim for attorney's fees, and, as thus amended, it is affirmed.

McCALEB, Justice (dissenting).

While I take no issue with the finding of the majority that the failure of The Texas Company to timely pay plaintiff production royalties was not justified, I do not subscribe to the view that its lack of reasonable grounds for withholding payment authorizes a forfeiture of the mineral lease.

Paragraph 8 of the lease provides, in part:

"After production of oil, gas, sulphur or other mineral has been secured from the land covered hereby, this lease shall

not be subject to forfeiture or loss, either in whole or in part, except after judicial ascertainment that the Lessee has failed to perform and discharge its obligations hereunder and has been given a reasonable opportunity thereafter to prevent such loss or forfeiture by complying with and discharging its obligations as to which Lessee has been judicially determined to be in default."

This clause is clear and explicit; it is the law between the parties and should be given full force and effect by this Court. Article 1901, Civil Code. It simply signifies the clear intent of the parties to be that the lease is earned when the lessee has secured production and that, thereafter, it shall not be lost or forfeited without first having a judicial ascertainment of the breach and then giving lessee an opportunity to perform its obligation.[1]

Public policy does not preclude the parties from thus contracting and the majority does not place its decision on that basis. Rather, it appears to be the majority view that Paragraph 8 of the lease is enforceable but only in a restricted degree—that is, in cases where the court finds that there is a bona fide dispute between the parties relative to an alleged breach by the lessee of its obligations. And it is reasoned that, since the failure to timely pay the production royalties in the instant matter was not

1. Compare Paragraph 4 of the lease which provides for immediate termination or forfeiture (before production) for lessee's failure to drill or pay delay rentals during the primary term.

founded on reasonable grounds, the lessee cannot avail itself of the judicial ascertainment provision.

This conclusion effects a re-writing of the lease by adding to Paragraph 8 a proviso that it will not apply unless lessee's failure to comply results from a bona fide dispute. But that is not the contract of the parties and the court should not change their agreement without the consent of each. And it will not do to say, as suggested by the majority, that application of Paragraph 8, as written, leads to an absurd consequence and therefore forms an exception to the principle set forth in Article 1945 of the Civil Code that "Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them". On the contrary, no absurdity results from applying the conditions agreed upon by parties to a contract which will prevent the forfeiture of accrued rights. This is particularly true when consideration is given to the fact that the judicial ascertainment clause applies only in instances where production has been secured and the lessee may be said to have earned the lease. Evidently, the stipulation of this clause resulted from a realization by the parties that summary forfeiture for acts of omission by the lessee would be unjust after the securing by lessee of production which necessarily involved great effort and expense on its part.

Finally, it is to be borne in mind that the law does not favor forfeitures; they are strictly construed and will not be maintained in the absence of clear provisions leaving no doubt as to the right of their exercise. People's State Bank v. United States Fidelity & Guaranty Co., 164 La. 95, 113 So. 779 and Schultz v. Texas & P. Ry. Co., 191 La. 624, 186 So. 49. In the case at bar, the clear provisions of the lease deny the forfeiture and should not, under the guise of interpretation, be held to warrant it. See Summers, Oil and Gas, Section 614 and authorities therein cited.

I respectfully dissent.