ACADIAN GEOPHYSICAL
SERVICES, INC.,
Appellant,

v.

Jack CAMERON, Charles Murrell, Richard Leger, Ray Guidry, Kenneth Freeman, Russell Lyons, Thomas W. Phillips, George Arnold Pee, Douglas E. Phillips, Terry Amis, and Nicky Blakeney, Appellees.

No. 10–01–025–CV.

Court of Appeals of Texas,
Waco.

July 9, 2003.

Brent C. Perry, Patrick Zummo, Zummo, Mitchell & Perry, LLP, Michael D. Miller, Glover, Miller, Lewis & Prebeg, P.C., Houston, for appellant.

Amy Douthitt Maddux, Michael L. Brem, Macey Reasoner Stokes, Jacalyn Hollabaugh, Baker Botts, Houston, for appellees.

Before Chief Justice DAVIS, Justice VANCE, and Justice RICHARDS (Sitting by Assignment).

## OPINION

DAVID L. RICHARDS, Justice (Assigned).

This is an appeal from a jury verdict awarding appellees: Jack Cameron, Charles Murrell, Richard Leger, Ray Guidry, Kenneth Freeman, Russell Lyons, Thomas W. Phillips, George Arnold Pee, Douglas E. Phillips, Terry Amis, and Nicky Blakeney ("the employees") damages against Acadian Geophysical Services, Inc. ("Acadian"), a seismic services corporation, for its breach of an employee profit-sharing agreement.[1]

The employees filed suit against Acadian, its corporate officers, and Petroleum Geo–Services, ASA ("PGS"), on the grounds Acadian breached employment agreements between the employees and Acadian's president, Blaine LeBlanc, under which each employee was entitled to 3 1/2% of the proceeds from Acadian's 1998 acquisition by PGS. The jury found in favor of the employees and awarded them damages for Acadian's breach.

Appellant presents six issues on appeal. We will affirm.

### The Authority of Acadian's President

Acadian presents the following question in issue one: "As a matter of law, can Acadian's president bind Acadian to giving the plaintiffs almost 40% of the proceeds that Acadian shareholders received from the sale or merger of Acadian when (1) Acadian itself would never receive these proceeds, (2) there is no evidence that the president had actual authority to take such extraordinary action, and (3) there was no evidence that Acadian did anything to hold the president out as having apparent authority to make such an extraordinary commitment or that any of the plaintiffs investigated the scope of his authority?"

In determining "no-evidence" issues, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences

---

1. Both parties filed notices of appeal. The employees intended to challenge the trial court's decision granting a directed verdict in favor of Petroleum Geo–Services, ASA ("PGS"); however, they voluntarily withdrew their appeal after Acadian filed a supersedeas bond. The present style of the case reflects the current position of the parties.

to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Contl. Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *In re King's Est.,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

■ "No-evidence" issues may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L. Rev. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

We begin with a review of Acadian's corporate history. Acadian is a Louisiana seismic services corporation that is registered to do business in Texas. It was incorporated in January of 1997 by a group of three men[2] experienced in the seismic industry. Each of those men became shareholders and officers.[3] One of the three, Blaine LeBlanc became Acadian's president. 100,000 shares of stock were authorized under the articles of incorporation: 32,500 shares were issued to the stockholders, leaving 67,500 shares for future issuance. Blaine LeBlanc met with Terry Amis, Nicky Blakeney, Ray Guidry, Charles Murrell and George Pee, all of whom had experience in the field, in an attempt to recruit them to join Acadian as employees. LeBlanc told them that if they came to work for Acadian, they would each receive 3 1/2% of the profit if the company ever went public or was sold, and that another 3 1/2% was being held for Ricky Leger, another possible recruit who was not present at the meeting. LeBlanc told them that 25% of the company's stock would be set aside to cover the portion promised to the group. Later Doug Phillips, Tom Phillips, Ricky Leger, Kenneth Freeman, Russell Lyons and Jack Cameron also joined Acadian under the same agreement.

The record also reflects a shareholder's resolution providing that all actions taken by LeBlanc "shall be deemed actions taken by the shareholders of this Corporation with like effect as if such actions were taken by the shareholders themselves" and that Acadian would indemnify him for any actions he took on behalf of the corporation.

The employees agreed to work for the company and, believing they would share in any sale of the company, provided services to Acadian during its initial startup period for which they were not paid a salary. Subsequently a large Norwegian oil exploration services corporation, "PGS" expressed interest in acquiring Acadian through a stock swap merger. The employees presented evidence that an Acadian in-house attorney, Eddie Guidry, subsequently falsely drafted a new corporate history for Acadian in 1998 which reflected among other things, a false set of board minutes reflecting that Guidry and Jim

---

**2.** Blaine LeBlanc, Richard Pharr, and Wallace Tilley.

**3.** A fourth corporate officer, James McGehee, joined Acadian a short time later.

McGhee, Acadian's chief financial officer were shareholders as of February 1, 1997. They also presented evidence that Guidry prepared new stock certificates falsely suggesting that all Acadian stock had been issued as of February 1, 1997. No stock was reserved for the employees. At the same time, Acadian sought to ensure that the PGS merger would go through by obtaining agreements with key Acadian employees that they would continue their employment. Employees Blakeney, Freeman and Phillips were asked to sign written employment agreements which again referred to a "profit-sharing" plan and were told that they would profit handsomely if the merger went through.

The merger closed in Houston on July 15, 1998. PGS paid $52,000,000 for Acadian, paying off $17,000,000 of debt and trading $35,000,000 of PGS stock for the stock of Acadian. Under the terms of the merger agreement the PGS stock was not available for ninety days. When the stock was released after that period its value had fallen to approximately $21,000,000. Acadian was merged as a wholly owned PGS subsidiary and all of Acadian's former officers and employees remained with the company under its new structure. In the months following the merger, the officers told the employees that they would receive their shares of the company and in the fall of 1998 the Acadian officers began contacting individual employees to tell them how much they received.

Each employee was told to keep the amount of his shares confidential because they were not all receiving the same amounts. Seven of the eleven employees received as little as 600 and as many as 8,000 shares of PGS stock in late 1998.

Others received nothing. When some of the employees to whom stock had been transferred later received quarterly financial reports from PGS, they understood for the first time that they had not received the 3½ shares they had been promised.

The employees filed suit against Acadian's officers and later added Acadian and PGS as defendants. The case was tried to a jury in October of 2000. The employees reached a settlement with the individual defendant officers during trial, and at the close of the evidence the trial court directed a verdict in favor of PGS. The jury found in favor of all of the named employees on appeal.[4] The jury awarded $500,000 to each of the employees, an amount approximately equal to the share LeBlanc had initially pledged would be set aside for them. After allowing for a credit for the settlement amounts agreed to by the corporate officers sued in their individual capacities, the trial court entered judgment on November 15, 2000. The employees initially appealed the directed verdict in favor of PGS; however, they agreed to a dismissal of that appeal after Acadian posted a supersedeas bond.

### Acadian's "No–Evidence" Claims

Acadian contends the employees' breach of contract claims fail as a matter of law because there was no evidence that as Acadian's President, Blaine LeBlanc had either the actual or apparent authority to make a profit-sharing agreement with the employees. Both parties agree that because the agreements between the employees and LeBlanc were made in Louisiana, the substantive law governing those agreements is controlled by Louisiana law.

---

4. The jury found against several other employees who were named plaintiffs in the suit in the trial court. Because no appeal was taken from that portion of the verdict we will not detail the evidence supporting the jury's verdict with regard to those employees not a party to this appeal.

## The Corporation President's Actual Authority

In Louisiana, "actual authority" involves manifestation by a principal to its agent that the agent is authorized to engage in a particular transaction. *Tedesco v. Gentry Dev., Inc.* 540 So.2d 960, 962 (La.1989). To ascertain whether the employees presented more than a mere scintilla of evidence showing a manifestation by Acadian to LeBlanc authorizing him to enter the employment agreements in question, we begin with a review of Acadian's written corporate by-laws. Acadian's by-laws invest in its President the following authority:

> The President shall be the chief executive officer of the Corporation; he shall preside at the meetings of the shareholders, shall have general and active management of the business of the corporation, and shall see that all orders and resolutions of the Board of Directors has not been elected (sic), the President, if a Director, shall preside at all meetings of the Board.

The central question presented is whether the Acadian's grant of "general active management of the business of the corporation" to LeBlanc through its written by-laws authorized LeBlanc to enter into profit-sharing agreements, including stock ownership, with Acadian employees as part of their employment compensation package. It has long been the law in Louisiana that a corporate president's authority to bind the corporation is dependent on either the "organic law of the corporation" (here, the corporate by-laws), the delegation of either express or implied authority from the board of directors, or implied from a habit or custom of doing business. *See Jeanerette Rice & Milling Co. v. Durocher,* 123 La. 160, 48 So. 780, 781 (1909).

Acadian's corporate by-laws are silent as to the provision of express authority to anyone to hire employees; however, the by-laws clearly anticipate the hiring of employees, in that the employees' right to indemnification from the corporation in legal proceedings, and the right of the corporation to seek liability insurance on behalf of its employees, are rights specifically acknowledged and detailed at length in the by-laws. Acadian's argument is apparently not that LeBlanc did not have the authority to enter general employment agreements on its behalf, but rather that he did not have the authority to bind Acadian to the specific terms of the employment agreements at issue here.

Acadian's argument is similar to the claim advanced by the corporation in *Mosley v. Dairyland Ins. Co.,* 614 So.2d 792, 799 (La.App.), *vacated on other grounds,* 620 So.2d 828 (La.1993). In *Mosley,* the corporation claimed that its president lacked the authority to reject uninsured motorist coverage on behalf of the corporation. The reviewing court rejected that argument in the following analysis:

> Plaintiff emphasizes the fact that there was no corporate resolution expressly authorizing [the chief executive officer] to reject UM coverage. However, there was apparently no corporate resolution authorizing him to procure coverage.
>
> . . .
>
> [The officer] had both express and implied authority to reject UM coverage for [the corporation]. Decisions involving insurance arise in the normal, day to day operation of a business. As a corporation cannot act alone, these decisions are made by its officers and directors. In particular, we note that the Articles of Incorporation of [the corporation] expressly gave [the chief executive officer] as president the authority to take any

action necessary to maintain the corporation's operation.

*Id.* at 799–800.

In our case, there was no provision in the corporate by-laws authorizing LeBlanc to bind Acadian to set aside unissued stock as part of an employee's compensation package; however, neither was there an express authorization permitting LeBlanc to hire employees. Instead, as noted above, the by-laws provided a broad grant of general authority to LeBlanc for the "active management of the business of the corporation." In addition, the employees presented evidence at trial that LeBlanc had the authority to hire employees and set the terms of their employment, and that nothing in Acadian's bylaws restricted LeBlanc from including stock as part of a employee compensation agreement. Finally, we note that LeBlanc testified he had the authority to issue stock:

QUESTION: Did you have written authority to issue stock certificates?

[LeBlanc]: I had authority as far as the incorporation articles, being the president.

QUESTION: As president you had authority to issue stock?

[LeBlanc]: Yes.[5]

We conclude there is more than a mere scintilla of evidence showing LeBlanc had actual authority to bind Acadian to employment agreements under which shares of stock would be set aside as part of its employees compensation package.[6] Because of our ruling that the evidence was sufficient to support the verdict on the ground that LeBlanc had actual authority, we need not decide whether the verdict can also be supported on the alternative theory that LeBlanc had apparent authority.

 Acadian additionally suggests, without further elaboration, that LeBlanc could not have had the authority to promise proceeds from the sale or merger of Acadian because Acadian never realized any proceeds from the merger. We do not agree. The evidence established that under the terms of the acquisition, PGS paid off Acadian's corporate debt and then exchanged Acadian's stock for its own stock. The employees' theory of the case was that in consideration for their employment, Acadian, through its president, had promised that a sufficient amount of Acadian stock had been set aside for them to each receive a 3 1/2% share of the company, but that Acadian had breached that agreement. The evidence established that Acadian shareholders made large profits from the merger. We find this evidence to constitute more than a mere scintilla of evidence that the employees had, in fact, suffered damages when Acadian breached the agreements made with the employees by LeBlanc and failed to compensate the employees pursuant to the agreements. Issue one is overruled.

### Acadian's Proffered Expert Testimony and Jury Instructions

In its second issue Acadian poses the following question: "In the alternative, if the above facts somehow give rise to some evidence that Acadian's president had the actual or apparent authority to bind Acadian to such an extraordinary obligation, did the trial court err in (1) excluding Acadian's expert's testimony, which would have assisted the jury in understanding corpo-

---

5. This testimony occurred during a deposition that was subsequently introduced as evidence at trial.

6. We are not presented with, and therefore do not address the question of the extent to which oral agreements are recognized under Louisiana law.

rate structure and the scope of a corporate president's duties and authority, and (2) refusing to submit proper instructions to the jury advising it as to when a corporation can be liable for the acts of its president, thus allowing the jury to assume, contrary to Louisiana law, that a president's authority is unlimited?"

In response to a motion in limine filed by the employees, Acadian proffered the testimony of Robert Ragazzo, a Professor of Law at the University of Houston Law Center. Acadian argues the trial court abused its discretion in excluding Ragazzo's testimony because he could have provided the jurors the following relevant information:

> The way in which a corporation is organized; why the corporation is separate from its shareholders; how shareholders own the company; how the company making money and the shareholders making money are not necessarily the same thing; that a company's president can bind the company to "ordinary" employment contracts, but not those that are "extraordinary," and giving examples of the difference; that [the employees] should have been on notice of the legal restrictions on any officer's authority to bind the company; and that it was unreasonable for plaintiffs to believe that LeBlanc had authority to promise them each 3 1/2% of Acadian.

The employees respond that Acadian's argument should be overruled for two reasons: (1) Ragazzo's testimony was never properly offered by Acadian; and (2) the trial court was within its authority to exclude the testimony because the jury was as equally competent as Ragazzo to form opinions on the ultimate issues in the case.

Professor Ragazzo's deposition was taken prior to trial. During a pretrial hearing on the employees' motion in limine the following exchange occurred:

THE COURT: Okay. [A motion in limine concerning] testimony as to what law applies.

[ACADIAN'S COUNSEL]: Your Honor, I'd like to inquire of Plaintiffs' counsel what this is aimed at.

[THE EMPLOYEES' COUNSEL]: Your Honor, they produced Professor Robert Ragazzo as an expert witness on legal issues in this case and he testified that he was going to help the—he was going to tell the jury what the law is and help them apply the law to the facts of this case and gave some extensive testimony about what Louisiana law was, and even though he's not licensed in Louisiana.

THE COURT: Okay. Everybody will surely agree that that's up to the Court and not the jury. And if this guy wants to give us some information, he gives it to the Court, right?

[ACADIAN'S COUNSEL]: Your Honor, there's two parts to that.

First of all, although it seemed to have been lost on [opposing counsel] during Professor Ragazzo's deposition, Professor Ragazzo's—the larger part of Professor Ragazzo's testimony is simply about corporate structure.

As the Court picked up on yesterday, Acadian didn't own itself. And what the Plaintiff's are asking for was, in fact, not received by Acadian, but was received by the shareholders.

And the largest part of what Professor Ragazzo, a professor of corporate law at the University of Houston Law Center is going to testify to is simple (sic) axiom: Corporations are owned by shareholders; when the shares are sold, how all of that works.

The second part of his testimony [opposing counsel] is close to, but he is not

going to tell the jury what the law is, but he is going to speak to, as people in his position often do in court, mixed questions of fact and law.

The mixed question of fact and law, that there is the application of fact and law is if these are the facts and this is the law, what is the result.

And the result is that the law (sic) didn't have authority, PGS is not the successor to Acadian.

Those are issues to which we believe he can—they are mixed questions. We have—we have briefed that, we are prepared to present the Court with that brief.

Like Plaintiffs' expert, it seems to me that doesn't have to be resolved as yet because Professor Ragazzo is the last witness that Defendants plan on calling.

THE COURT: Give me a copy of his deposition, too.

[ACADIAN'S COUNSEL]: Be happy to, Your Honor, and can we give you a copy of the brief that we prepared in support of that?

THE COURT: Right.

And as far as any reference to Louisiana law goes, of course, you're not going to make that; Texas law either, for that matter, unless I tell them what it is.

[ACADIAN'S COUNSEL]: Of course, Your Honor.

THE COURT: How do you spell that guy's name?

[ACADIAN'S COUNSEL]: Ragazzo, Your Honor. R-a-g-a-z-z-o, Professor Robert.

Other than the trial court's statement that he was not going to permit the witness to tell the jurors what the applicable Louisiana and Texas law was, the trial court never ruled on the motion in limine. Moreover, other than responding "of course, Your Honor," Acadian's counsel made no response to the trial court's statement. No further mention of Professor Ragazzo was made until Acadian's counsel offered Ragazzo's entire pretrial deposition as a bill of exceptions:

[ACADIAN'S COUNSEL]: We have offered—the Court has sustained Plaintiffs' motion in limine to our offer of the testimony and opinions of Professor Ragazzo. As I appreciate what we've agreed to that we will simply tender the deposition of Professor Ragazzo as—as the substance of that testimony without having to bring him down here and do this, that and the other.

THE COURT: Okay. So I have a deposition. I don't know if this is the one you want to use, but—

[ACADIAN'S COUNSEL]: That's acceptable to me if it's acceptable to [opposing counsel].

[THE EMPLOYEES' COUNSEL]: That's fine.

[ACADIAN'S COUNSEL]: So this is our proffer—this is our bill, I suppose, on the excluded testimony of Professor Robert Ragazzo, which is R-a-g-a-z-z-o.

THE COURT: Okay. All right.

■ We agree with the employees that the proffer of Professor Ragazzo's deposition testimony was insufficient to properly perfect Acadian's instant complaint for appellate review. The record is admittedly confusing; however, even if we agreed with Acadian's position that the trial court *did* grant the motion in limine, the fact remains that Acadian made no attempt to offer the evidence at trial, a necessary prerequisite for appellate review. *See* Tex.R. Evid. 103(a)(2). An adverse ruling on a motion in limine does not preserve a complaint. *State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863, 866 (Tex. 1988). Moreover, the Texas Supreme Court has stated that a bill of exceptions

does not constitute an offer of the evidence. *See Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). Even were that not the law, the fact that here Acadian tendered Professor Ragazzo's entire deposition, which contained among other things, alleged pronouncements of law by that even Acadian's trial counsel agreed should only be provided to the jurors by the trial court, provides an additional reason why the issue was not properly preserved for review. At trial Acadian's counsel not only did not object, but rather voiced agreement with the trial court's statement that only he (the judge) should instruct the jurors on the applicable law. Now, on appeal, Acadian argues for the first time that Ragazzo should have been permitted to explain, among other things, the legal restrictions on a corporate officer's authority to bind a company. Such variance is not permitted. *See In re C.Q.T.M.*, 25 S.W.3d 730, 737–38 (Tex. App.-Waco 2000, pet. denied). Because we hold the issue is not properly preserved for appellate review, we need not address the employees alternative argument that the testimony was properly excluded on its merits.

■ The secondary question presented in issue two is whether the trial court erred in failing to provide the following jury instruction requested by Acadian:

> A corporation's president only has authority to obligate the company in "day to day" matters, not those that are "extraordinary."

> For apparent authority to exist, there must have existed, prior to the time of the act complained of, a "custom" or "usage," or "holding out" for an appreciable length of time by the corporation. A single instance is insufficient to create a custom or usage or constitute a holding out.

> A person may not blindly rely on the assertions of an agent. One dealing with an agent has a duty to determine whether the authority purportedly granted by the principal will permit the proposed act by the agent.

The jury instruction actually given by the trial court stated:

> An agreement arises only where both parties have mutually consented to its terms. The minds of both parties must meet as to the primary matters involved, or no consent exists.

> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

> A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

> Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

> Apparent authority has two requirements: (1) The principal must make some form of manifestation to an innocent third party; and (2) The third party must rely reasonably on the purported authority of the agent as a result of the principal's manifestation.

■ We review a trial court's decision to refuse a particular instruction under an abuse of discretion standard of review. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex.2000). The trial court has considerable discretion to determine necessary and proper jury instructions. *Id.*

Acadian's requested instruction on a corporation president's authority was very similar to the instruction actually provided by the court. Both the requested instruction and instruction actually given referenced the rule that a general grant of authority to a person to do an act authorized that person to do whatever else is proper, usual, and necessary to perform the act expressly authorized. The use of the term "usual" in the instruction actually given is sufficiently similar to the term "ordinary" in the requested instruction. We do not perceive that the instruction's failure to provide the converse instruction that a person authorized to do an act is not authorized to do an "extraordinary" act was necessary. We also do not conclude the requested instruction's references to the need for evidence of "customs" and "usages" for "appreciable lengths of time" and prohibitions against "blind reliance" by third parties on the assertions of agents were required to be included in the charge. Acadian's cited authority, *Manuel Truck & Equipment Co.*, does not require that the trial court provide the instructions Acadian requested. *See Manuel Truck & Equip. Co. v. B.G. Hooker Petroleum Transport, Inc.*, 430 So.2d 1367 (La.App.1983). Moreover, the trial court was authorized to conclude that such instructions were inappropriate in the instant case given that our facts involved representations allegedly made by the president of a corporation to prospective employees during employment negotiations. *See First Interstate Bank v. First Natl. Bank,* 928 F.2d 153, 156 (5th Cir.1991) (holding agent's position as senior vice-president of bank lent credence to third party's belief that agent had authority to sign bond purchase agreement); *see also Cook v. Ruston Oil Mills,* 170 La. 10, 127 So. 347, 353–54 (1930) (stating very use of term "manager" when applied to corporate officer, conveyed idea to ordinary mind that the one named had been committed the management of the affairs of the corporation and did not require third party to show authority for manager's act). Having determined the trial court did not abuse its discretion in denying Acadian's requested jury instructions, we overrule issue two.

### Acadian's "No Evidence" Challenge to the Jury's Determination of the Parties' Intent in Acadian's Profit-sharing Plan

Acadian presents the following question in issue three: "Does the use of the term "profit-sharing plan" in written employment contracts somehow evince that the plaintiffs were to receive a specific percentage not of profits, but of proceeds from the eventual sale of Acadian, especially when there was no evidence that the plaintiffs were ever told that this term meant anything of the sort?" A related question is presented in Acadian's fourth issue: "Is the evidence legally sufficient to support the jury's finding that an oral contract existed between Acadian and certain individual plaintiffs to provide those plaintiffs with 3 1/2% of the proceeds of the sale of Acadian, when any alleged contract was superseded by written employment contracts that did not contain anything resembling such a term?"

■ A challenge to the legal sufficiency of the evidence by the party not having the burden of proof at trial is to be addressed by the reviewing court as a "no evidence" issue. *Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 183–84 (Tex.App.-Fort Worth 1995, no writ).

The oral employment agreements of some of the employees were later reduced to writing. Some of the written agreements contained the following language: "Employer further agrees to pay Employee a share of the profits through Employ-

er's profit-sharing plan." Another written agreement provided that Acadian "does further agree to pay [employee], a share in Acadian Geophysical Services, Inc.'s profit share program." Still other agreements refer, without further elaboration, to an "executive profit share program."

■ Exactly what was meant by the terms "profit-sharing plan" "profit share program" and "executive profit share program" was hotly contested at trial.[7] The jury heard testimony that the first employee to whom the written agreement was presented, Ricky Leger, was told by Le-Blanc before he signed the agreement that the profit-sharing plan referred to the 3 1/2% share promised earlier to each employee orally by LeBlanc and there was evidence employees were told they were "partners" who will "all be millionaires" if "the deal goes through."[8]

■ Under Louisiana law, the interpretation of a contract is determined from the common intent of the parties. LA. CIV.CODE ANN. art. 2045 (West 1987); see also Saucier v. John–Clai Co., 408 So.2d 27, 29 (La.App.1981) (holding the true intent of the parties controls interpretations of agreements between the parties). The intent is determined by the parties' objective expressions, rather than subjective intent. See Hunt Trust v. Crowell Land & Mineral Corp., 210 La. 945, 28 So.2d 669, 673 (1946). Ambiguous terms are to be interpreted in light of the nature of the agreement, equity, usages, and the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the parties. LA. CIV.CODE ANN. art. 2053 (West 1987).

The jurors heard three different interpretations of the similarly worded profit-sharing plans: (1) The employees presented evidence that LeBlanc represented that the term referred to their 3 1/2% ownership of the company; (2) there was evidence the term referred to a Christmas bonus and safety award provided by Acadian to its employees in 1997, for which each employee received between $1,500 and $15,000, based on their longevity with the company; and (3) there was evidence the term referred to a 401(k) program which the company never actually established.

■ When an agreement is ambiguous, the question should be submitted to the jury, whether or not the parties have pleaded ambiguity. See Sage Street Assoc. v. Northdale Constr. Co., 863 S.W.2d 438, 444–45 (Tex.1993) (holding jury question was presented by ambiguity in construction agreement). That the ambiguity presented a legitimate fact issue requiring resolution by the jury in our case is made clear by the requirement under Louisiana law that ambiguity be resolved, in part, by looking to the conduct of the parties both before and after the formation of the contract. See LA. CIV.CODE ANN. art. 2053. Here, the conduct of the parties in relation to the profit-sharing provision of the agreement was hotly disputed and presented an issue requiring resolution by a fact finder. Moreover, the trial court acted within its discretion in permitting the employees with written agreements to introduce evidence of their prior oral agreements, because LeBlanc, on behalf of Acadian, allegedly represented that the profit-sharing plan referenced in the written agreement was, in fact, the 3 1/2% share

---

7. The term is not defined under Louisiana Law.

8. There is evidence PGS wanted Acadian to obtain written employment agreements with its key employees as a prerequisite to its acquisition in order to ensure the employees' would continue to work for PGS following the acquisition.

he promised in his earlier oral agreement. *See* LA. CIV.CODE ANN. art. 2053 (permitting explanations of ambiguous terms by prior conduct of parties before formation of the contract). Because there was more than a mere scintilla of evidence supporting the jurors' affirmative answer to special issue number one,[9] issues three and four are overruled.

■ Another legal sufficiency challenge is advanced by Acadian in its fifth issue: "Is the evidence legally sufficient to support the jury's finding that Acadian and Kenneth Freeman mutually agreed that Freeman would be entitled to 3 1/2% from the proceeds of a sale or merger of Acadian when no witness testified as to the existence of such an agreement and Freeman himself admitted that he was never promised this?"

Kenneth Freeman, a crew chief of one the seismic crews, testified that he met with LeBlanc in the spring of 1997 in Martinville, Louisiana at which time LeBlanc offered him employment with Acadian. According to Freeman, LeBlanc told him that if he agreed to work for Acadian he would receive part of the company if it ever sold. Freeman initially turned the offer down; however, when LeBlanc later offered him employment under the same conditions, but with a higher monthly salary, he accepted. Freeman testified at length about the profit-sharing language contained in his written employment agreement:

> Q. And does [your written employment agreement] say that Acadian Geoservices, Inc., does further agree to pay Ken Freeman a share in Acadian Geophysical Services Inc.'s executive profit-share program?

A. Yes, sir it does.

Q. And so if you look at Mr. Blakeney's [written agreement] over here and compare, is everything the same on that language going all the way through an amount equal to the following other officers of the corporation except for your name being on yours and Nicky's name being on his?

A. Yes, sir. Except for some of the language at the top of the—

Q. I'm talking about just that part of the profit-share program.

A. Yes, sir, that stays the same.

Q. Do you know any reason that Mr. LeBlanc would tell any of you crew chiefs what that term meant in one resolution and mean it something different for the rest of you?

A. No, sir, I wouldn't.

Q. When you had a meeting with Mr. LeBlanc where he made the statement that if the sale went through—or there was an offer to sell and your part would be $500,000 to a million dollars, which of the other crew chiefs was with you?

A. Mr. Ricky Leger.

Q. And was he talking to each of you when he said that?

A. Yes, sir.

Q. There was no difference between what you were supposed to get and what Mr. Leger was supposed to get according to Mr. LeBlanc?

A. Yes, sir.

Q. When you had the visit with Mr. LeBlanc a couple of weeks later where he said that it was probably going to be a sale to PGS and your part would be

9. The jury instructions required that the jurors answer the following question: "As to each of the following plaintiffs, did that plaintiff and Acadian mutually agree that 'profit-sharing plan' or 'executive profit-sharing plan,' as used in the written agreements, was intended to include 3½ percent of the proceeds from a sale or merger of Acadian?"

$500,000, were there any other crew chiefs with you then?

A. Repeat that, please sir?

Q. Was there any other crew chief with you when Mr. LeBlanc said that your part, if the sale to PGS went through, would be $500,000?

A. Yes, sir. Mr. Ricky Leger.

Q. Mr. Leger was there, and was the same statement made to Mr. Leger?

A. Yes, sir.

Q. And you were supposed to get the same amount Mr. Leger got?

A. Yes, sir.

Q. According to Mr. LeBlanc?

A. Yes, sir.

We hold this testimony amounted to more than a mere scintilla of evidence that profit-sharing language in Freeman's employment agreement entitled him to the same share of the company promised individually to the other employees. Issue five is overruled.

### The *Forum Non Conveniens* Issue

■ In its final issue Acadian asks: "Did the trial court abuse its discretion in refusing to dismiss this suit based on *forum non conveniens* when all defendants are amenable to process in Louisiana, the live witnesses were from Louisiana, and the cause of action submitted to the jury arose in Louisiana and was governed by Louisiana law?"

■ We review a trial court's order concerning the Texas *forum non conveniens* statute under an abuse of discretion standard. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 71.051(b) (Vernon Supp.2003); *Direct Color Servs., Inc. v. Eastman Kodak Co.*, 929 S.W.2d 558, 563 (Tex.App.-Tyler 1996, writ denied). The test for abuse of discretion is not whether in the opinion of this court the facts present an appropriate case for the trial court's actions. Rather, it is a question of whether the trial court acted without reference to any guiding rules and principles. *Id.* Another way of stating the test is whether the act was arbitrary or unreasonable. The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985).

The Texas *forum non conveniens* statute states:

With respect to a claimant who is a legal resident of the United States, on written motion of a party, a claim or action to which this section applies may be stayed or dismissed in whole or in part under the doctrine of *forum non conveniens* if the party seeking to stay or dismiss the claim or action proves by a preponderance of the evidence that:

(1) an alternate forum exists in which the claim or action may be tried;

(2) the alternate forum provides an adequate remedy;

(3) maintenance of the action in the courts of this state would work a substantial injustice to the moving party;

(4) the alternate forum, as a result of the submission of the parties or otherwise, can exercise jurisdiction over all the defendants properly joined to the plaintiff's claim;

(5) the balance of the private interests of the parties and the public interest of the state predominate in favor of the claim or action being brought in an alternate forum; and

(6) the stay or dismissal would not result in unreasonable duplication or proliferation of litigation.

Tex. Civ. Prac. & Rem.Code Ann. § 71.051(b).

 Acadian bore the burden in the trial court of showing the above factors required dismissal in favor of venue in Louisiana. *See Van Winkle–Hooker Co. v. Rice,* 448 S.W.2d 824, 827 (Tex.Civ.App.-Dallas 1969, no writ). We cannot say under the above test that the trial court abused its discretion in refusing Acadian's requested action. Nor can we say the trial court's decision worked a substantial injustice to Acadian under the meaning of § 71.051(b)(3). We agree with the employees that our sister court of appeals' consideration of the pretrial jurisdictional challenge made by two of Acadian's shareholders in the instant case is instructive on this issue. There the reviewing court held:

> . . . Texas has an interest in resolving this dispute, which involves alleged promises that may have been made to Texas residents regarding the sharing of profits of corporations that are licensed to do business in Texas. Third, [Acadian's officers], residents of various states, including Texas, can obtain as convenient and efficient relief in Texas as would be available in any other state. Fourth because [Acadian's officers] Pharr and McGehee were the only two of the six defendants to contest jurisdiction, this case is set to proceed in Texas, regardless of our decision in this appeal. Thus, it is in the interest of interstate judicial system efficiency to require all of the defendants to defend their case in Texas.

*Pharr v. Cameron,* No. 01–00–234–CV, 2000 WL 994265, at *4 (Tex.App.-Houston [1st Dist.] July 20, 2000, no pet.) (not designated for publication). We agree that it was in the interest of interstate judicial system efficiency that this case, which involved employment representations made to Texas residents by the officer of a corporation registered to do business in Texas, be tried in Texas. Because the trial court's order refusing to dismiss the employees' claim on grounds of *forum non conveniens* did not constitute an abuse of discretion, issue six is overruled.

The trial court's judgment is affirmed.

Justice VANCE dissenting.

BILL VANCE, Justice, dissenting.

I would sustain Acadian's second issue and hold that the Plaintiffs' claims based on "profit sharing plans" fail as a matter of law.

PGS acquired Acadian through an transaction described as a "reverse triangular merger." PGS caused a wholly-owned subsidiary to merge with Acadian, and Acadian's shareholders received shares of PGS in exchange for their shares of Acadian. Acadian survived as a subsidiary of PGS. Acadian received no "proceeds."

Furthermore, the plaintiffs' contracts relate to "profits." Proceeds that Acadian might have received from PGS does not translate into profits.

We sustain a no-evidence issue when the record reveals one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or rules of evidence bar the appellate court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–363 (1960)). I find no evidence to support a finding that "profit sharing plan" means "proceeds"; indeed, the evidence conclusively establishes the opposite of

that fact. *See id.* Thus, the judgment that the plaintiffs are entitled to any part of the "proceeds" of the "sale" of Acadian should not stand. Because the majority holds otherwise, I respectfully dissent.